**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dennis Frederick HOKER, Defendant-Appellant.**

**No. 73–1810**

**Summary Calendar.***

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1973.

Rehearing Denied Oct. 11, 1973.

J. E. Tatum, Houston, Tex. for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before, JOHN R. BROWN, Chief Judge, DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Hoker appeals from his conviction and sentence after guilty verdicts in a jury trial for two violations of the Controlled Substances Act: Count One for knowingly and intentionally possessing a controlled substance under Schedule I, 446 pounds of marijuana with intent to distribute [1] on September 16, 1972, and Count Two for knowingly and intentionally importing into the United

---

* Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Company of New York, et al., 5 Cir. 1970, 431 F.2d 409, Part. I.

1. Title 21, U.S.C. Section 841(a)(1).

States from Mexico a controlled substance under Schedule I (the same 446 pounds of marijuana).[2] The appellant, a 20 year old male with no prior criminal convictions, but with a juvenile record of probation, was sentenced to four years confinement and a $2500 fine, with a special parol term of two years to follow, as to Count One. A suspended five year confinement sentence, followed by a two year term on special parole was imposed as to Count Two. We reverse because the trial judge took over the prosecution to an extent preventing a fair trial.

In essential particulars this case is governed by our decision in United States v. Lanham, 5 Cir. 1969, 416 F.2d 1140. *Lanham* involved a charge under the Dyer Act, Title 18 U.S.C. Section 2312, of interstate transportation into Texas of a stolen Volkswagen which had disappeared without the owner's knowledge or consent from the French Quarter in New Orleans, Louisiana.

Proof of the defendant's possession of the stolen car was based on its being found on a parking lot in Houston a day or so after it vanished in New Orleans. *Lanham* and a co-defendant, Larson, were arrested shortly thereafter in a white Volkswagen in Terrell County, Texas. The white VW in turn had been stolen from the Houston parking lot where the red VW was found. At *Lanham's* separate trial both he and Larson testified that they had hitch-hiked to Houston in a black Ford with a Mr. Wilson, and were also hitch-hikers in the white VW. They disclaimed connection with the red VW.

We reversed because the "trial judge improperly injected himself into the trial below in such manner and to such extent as to deny the appellant a fair and impartial trial," citing specifically Gomila v. United States, 5 Cir. 1944, 146 F.2d 372; Hunter v. United States, 5 Cir. 1932, 62 F.2d 217, and Adler v. United States, 5 Cir. 1910, 182 F. 464; and generally 23 C.J.S. Criminal Law § 987, p. 996; Bollenbach v. United States, 1946, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354; Starr v. United States, 1894, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841; United States v. Link, 3 Cir. 1953, 202 F.2d 592.

The extent to which the trial judge took over the prosecution in Lanham was shown by actual count of the questions asked Larson and Lanham[3] by defense counsel, prosecutor, and judge.

Despite court-appointed counsel's failure to object in *Lanham,* we found that "plain error", Rule 52(a), F.R.Crim.P. had occurred and reversed saying:

> " * * * The impartial trial atmosphere, the 'cold neutrality of an impartial judge', the defendant Lanham's credibility, his presumption of innocence, and any chance whether guilty or innocent, that he had of a successful defense, all were demolished, along with his Fifth Amendment right not to be deprived of his liberty without due process of law."
> * * *

The situation here presents a close parallel to *Lanham* with the addition that, as noted infra, defense counsel

---

2. Title 21, U.S.C., Sections 952(a) and 960(a)(1).

3. As to the witness Larson, Lanham's counsel asked him 36 questions on direct, the prosecuting attorney asked 55 questions on cross-examination, whereupon the trial judge asked 119 questions in a probing, searching, type of examination. The defendant Lanham received the same treatment. His counsel asked him 23 questions, the government attorney 17 questions, and the trial judge followed with 66 questions.

Unlike what happened in the case at bar, the trial judge examined an FBI agent extensively and also called in rebuttal as a court witness, Louis Teal, a co-inmate of Lanham and Larson in the Harris County Rehabilitation Center, the thrust of whose testimony was to impeach the defendant Lanham by statements allegedly made to him at the Center. But this simply added fuel to the fire. The crucial judicial conduct requiring reversal was the close and extended court cross-examination of Lanham and Larson.

twice preserved the point by objection to the court's examination.

Hoker was stopped for inspection at the International Bridge in Laredo, Texas on September 16, 1972 travelling in a 1955 green Chevrolet pick-up truck with Texas plates. The Quarantine Inspector who initially halted Hoker called in U.S. Customs Inspector McManus, who advised him of his *Miranda* rights. At that point, Hoker said, according to the agent present, "Inspector, you are going to search my vehicle. If you find any hard stuff in that vehicle will it go harder with me than if they just find plain weed in it?". The truck contained six concealed compartments under its fenders and body, from which the 446 pounds of marijuana were removed.

The appellant denied knowledge of the presence of the marijuana in the truck, both to Customs agents and at trial. His defense was that a chance acquaintance in a bar in Nuevo Laredo on the Mexican side offered him two hundred dollars to drive the truck to Houston. As his funds were low and he had no job, he accepted the offer.[4]

Whether Hoker's constructive possession of the marijuana was knowing and intentional with intent to distribute was the key issue before the jury as to Count One. His possession, since he was alone and driving the truck, was not subject to dispute. As to Count Two, the importation count, inasmuch as he was seen driving the truck across the International Bridge and was in sole control of the truck, the central jury issue was whether or not the importation of the marijuana from Mexico was done knowingly and intentionally. Hoker's credibility and the reasonableness of his testimony were thus pivotal to his attempt to defend against both charges. Guilty knowledge and intent were the only issues present.

Following 70 questions to Hoker by his counsel and 238 questions on detailed and tortuous cross-examination by the prosecuting attorney, the trial judge entered the fray with 79 searching questions of his own, in addition to seven or eight clarifying questions from the court during the government's cross-examination. Midway in this examination, Hoker's counsel objected, and was summarily overruled.[5]

The only witnesses called by the defense, all of whom appeared on the stand before he did, were Hoker's mother, Manual Martinez, who testified as to his former ownership of the truck and its sale to a man named Sam Perez, and Miss Garcia, a customs employee who had had custody of the truck and its parts. Mrs. Hoker corroborated her son's testimony as to his age, his employment since finishing high school, and the fact that he had left Houston on September 15, 1972 as a hitch-hiker. Her testimony preceded that of the appellant.

After the defense rested, the government proceeded to call two rebuttal witnesses,[6] the principal one being the

---

4. Hoker had ten $20 bills, a $5 bill, a $10 bill and some silver on his person when arrested.

5. We quote the colloquy from the record:
   MR. TATUM:
   Excuse me, Your Honor. I have a matter to take up with the court at this time in the absence of the jury.
   THE COURT:
   You can come up and tell me.
   (The following (124) proceedings were had without the hearing of the jury)
   MR. TATUM:
   At this point, the court has taken over the function of the prosecutor.

   THE COURT:
   You object to my asking the questions?
   MR. TATUM:
   For clarification, all right. But for cross-examination, we do object.
   THE COURT:
   Okay, you have made your objection.

6. The other rebuttal witness was Customs Inspector McManus, who testified Hoker was not intoxicated when he was stopped at the border, and also that in searching the 1955 Chevrolet truck he failed to find a spare T-Shirt, described by Hoker as his only luggage.

night clerk of the El Rio Motel in Nuevo Laredo, where Hoker had testified he was registered in Room 128 on September 14, and again on September 15. This witness, Adolfo Fonseca, had some language difficulties. He testified in part without an interpreter and in part through an interpreter. He produced first a daily combined registration record from the motel which failed to show Hoker registered in Room 128 on September 14 at all. It was registered to Miguel Rascon. Hal Sparks of Houston was in Room 132, and several other young men were in adjoining rooms, all from Houston. Neither was the appellant registered for the 15th.[7]

When Fonseca's examination ended, the prosecuting attorney, still on rebut-

tal, called the appellant as a witness "for further cross-examination." Permission for this procedure was not sought and its propriety was not questioned by the court or by defense counsel. 67 questions were put to the appellant by the prosecutor, probing the discrepancies between Hoker's original testimony and that of Fonseca, and establishing appellant's prior acquaintance with Sparks and his arrival at the motel with Sparks, among other matters. The trial judge again took over the inquisition for 47 questions before defense counsel interposed an unavailing objection. The objection and the ruling are set forth in the margin along with the court's examination.[8]

---

7. Later, on further cross-examination by defense counsel, after the extended examination of Hoker related infra, Fonseca brought into court the actual registration cards for Room 128, Room 132, and adjoining rooms for September 13 through September 16. The card for Room 132 showed Hoker's name added for September 14 as an additional occupant to Sparks'. But Hoker's presence in the motel on the night of September 15 was not indicated by any registration record. When this testimony was concluded, government counsel sought, but was denied, leave to recall the appellant once again, "in view of the circumstances that developed".

8. The flavor of this examination and its stern prosecutional tone is best shown by quoting it, including counsel's objection and the court's ruling:
THE COURT:
    You roomed with Sparks, is that what you said?
THE WITNESS:
    Yes, sir.
THE COURT:
    Why didn't you tell us that earlier, Mr. Hoker?
THE WITNESS:
    I wasn't asked.
THE COURT:
    Go ahead.
(161) Q (by the Assistant U.S. Attorney, Mr. Alfaro) So now, let's start all over again, what room did you stay in, Mr. Hoker?
A I'm not sure. I came in both nights drunk. I was just kicking around. I can't even tell you the motel room that I'm staying in right now.

Q You cannot, Mr. Hoker?
THE COURT:
    Are you coming in drunk every night now?
THE WITNESS:
    Just those two nights.
THE COURT:
    You told us you cannot tell us the hotel room you were in right now.
THE WITNESS:
    No, sir.
THE COURT:
    I might say, Mr. Hoker, it seem strange to me when I was asking you about how you got to El Rio Motel, where you had been dropped off by the person who gave you a ride into Laredo, and you told me out here at the intersection of two highways, and that you walked principally from there to the bridge and across into Mexico, did you not?
THE WITNESS:
    (No response)
THE COURT:
    Did you tell me that or not?
THE WITNESS:
    Could you repeat that again, please.
THE COURT:
    When I was inquiring of you, is it not a fact that you told me you had gotten a (162) ride into Laredo by someone who dropped you off at the intersection of 35 and 59?
THE WITNESS:
    Yes, sir.
THE COURT:
    And you had gotten to the bridge, I believe you said, principally by walking?
THE WITNESS:
    Yes, sir.

THE COURT:
You walked across the International Bridge?

THE WITNESS:
Yes, sir.

THE COURT:
What is the fare for pedestrians?

THE WITNESS:
Fifteen cents, I believe. I'm not sure.

THE COURT:
Were you drunk or sober at the time you went across the bridge?

THE WITNESS:
I was sober.

THE COURT:
Okay. You got across the bridge. Incidentally, do you pay the money to a person or do you drop it in a coin box or anything of that sort, this fare at the bridge?

THE WITNESS:
I'm not sure. I can't remember what I did.

THE COURT:
Did you walk across the bridge, and in doing so, you then proceeded to inquire, you told me, of several persons who you simply met on (163) the street, "Where is a good place to stay", something to that effect.

THE WITNESS:
Right.

THE COURT:
And someone told you El Rio Motel.

THE WITNESS:
Yes, sir.

THE COURT:
And that is how you happened to go to El Rio, because some stranger on the street had recommended it as a nice place. Is that what you told me earlier?

THE WITNESS:
Did I say it was a stranger on the street? I believe I testified that it was the first person I met that spoke English.

THE COURT:
Was it not a stranger?

THE WITNESS:
No, sir, it was not a stranger.

THE COURT:
Who was it?

THE WITNESS:
It was Sparks.

THE COURT:
Did you meet him on the street when you and he were walking on the sidewalk or was he giving you a ride in his car?

THE WITNESS:
He was giving me a ride.

THE COURT:
Where did he pick you up?

THE WITNESS:
Pardon?

THE COURT:
What (sic) did he pick you up?

(164) THE WITNESS:
On the other side.

THE COURT:
You have told us that. How far from the International Bridge?

THE WITNESS:
Quarter-mile, half-mile, something like that. I can't really say.

THE COURT:
You had walked that quarter or half-mile from the bridge before you were picked up?

THE WITNESS:
Yes, sir.

THE COURT:
And Mr. Sparks is the one that stopped for you?

THE WITNESS:
Yes, sir.

THE COURT:
You asked him then for directions to a motel?

THE WITNESS:
Yes.

THE COURT:
That is the first person that you had asked directions to a motel?

THE WITNESS:
It is the first one that I got hold of that spoke English.

THE COURT:
So in truth and in fact, you (165) had not asked anyone, during this quarter-mile walk or half-mile from the bridge, had you, Mr. Hoker?

THE WITNESS:
Attempted.

THE COURT:
You passed any number of motels during that walk, did you not, or hotels?

THE WITNESS:
Mostly liquor stores.

THE COURT:
You did not pass three or four hotels?

THE WITNESS:
None that really appealed to me, because I was just there kicking around.

THE COURT:
So it was Sparks, then, that recommended the El Rio?

THE WITNESS:
Yes, sir.

THE COURT:
And you and he then drove together and you both registered?

THE WITNESS:
Yes, sir.

THE COURT:
You personally signed a card both the night of the 14th and the night of the 15th "D. F. Hoker, Houston, Texas"?

Following the objection, the court's examination of Hoker proceeded for another 27 questions as set forth in the margin.[9] Six questions by the prosecu-

THE WITNESS:
The night of the 15th. The night of the 14th I imagine that he put my name on the card.

THE COURT:
Did you not tell us earlier that you had registered and paid for the first night and then you had to register again and pay for the (166) second night?

THE WITNESS:
To the best of my knowledge, I paid.

THE COURT:
Did you not so testify earlier?

THE WITNESS:
I paid both nights. Both nights I paid. Whether or not my name was on the registration slip the 14th, I'm not sure. But to the best of my knowledge, it is.

THE COURT:
I did not ask you if it was on there. Did you personally sign your name on the night of the 14th when you first arrived with Sparks?

THE WITNESS:
No, sir.

THE COURT:
Why did you tell us earlier that you had, Mr. Hoker, if that is not true?

THE WITNESS:
I don't remember saying that.

THE COURT:
Why did you not tell us earlier that in truth and in fact you were here with a friend?

THE WITNESS:
Because I didn't want to involve anybody else that wasn't necessary.

THE COURT:
Of course from what you have told us there was no crime involved here.

(167) THE WITNESS:
Bringing an innocent man's name into the picture.

THE COURT:
Let me ask you another question or two. The night of the 14th when you drove up to the El Rio Motel, did you get out and go into the office?

THE WITNESS:
Yes, sir, I did.

THE COURT:
Sparks get out and go in the office?

THE WITNESS:
Yes, sir, he did.

THE COURT:
You were sober at that time?

THE WITNESS:
Yes, sir.

THE COURT:
You had never been there before?

THE WITNESS:
No, sir.

THE COURT:
Do I not recall that you told us that you had selected El Rio because it was close to the club that you wanted to patronize?

THE WITNESS:
Yes, sir. That's the same reason Mr. Sparks selected it also. We went there together.

THE COURT:
But you didn't know where the club was when you registered at the El Rio?

THE WITNESS:
No. He did.

MR. TATUM:
I would like to perfect the (168) bill in the absence of the jury at this time.

THE COURT:
You can wait until I get through.

MR. TATUM:
Your Honor, at this point, I want to perfect my bill in the absence of the jury.

THE COURT:
And I told you to sit down until we get through with the witness.

MR. TATUM:
As long as I can object to it, object to the proceedings at this time of the court taking over the rule of prosecution.

THE COURT:
All right, sir.

9. BY THE COURT:
Q Didn't you tell us that the taxi driver told you where the club was?
A He was the one that told us where the club was.
Q On the 14th, you and Sparks both went into the motel at the time of registration?
A Yes.
Q You are confident that Sparks registered?
A Yes, sir.
Q You do not remember whether you registered?
A I know I didn't sign my name. I figured that he put my name on the registration slip. But it is definitely, I signed it on the 15th, I definitely signed it, because he wasn't there. He had left the morning of (169) the 15th.
Q And you and he occupied the same room?
A Yes sir.
Q You had known him in Houston?
A Yes, sir.
Q Did I understand you say at school?
A Bible School.
Q Bible School?
A Yes.

tor followed and Hoker's counsel was then permitted to attempt his rehabilitation in "redirect examination" consisting of 21 questions. The appellant related that he and Sparks were both Jehovah's Witnesses, acquainted through church activities, and that since Sparks was in no way involved in the marijuana offenses, he was reluctant to bring Sparks' name into his earlier testimony. At this point the jury was excused and the trial judge afforded defense counsel an opportunity to expand his objections:

"THE COURT:

Now you may take any exceptions you wish to my interrogating the witness.

MR. TATUM (defense counsel):

I have nothing for the record, and I want the court to know that I have no disrespect, but it is a tremendous disadvantage to the defendant when there is no opportunity to make objections.

Q He was a close friend so that you agreed to share a hotel room?
A Yes.
Q He was going back to Houston on the 15th?
A I do not know.
Q You do not know where he was going?
A No, sir.
Q You did not ask him where he was going when he left you?
A No.
Q He is your roommate, you have been out drinking together on the night of the 14th. Having done that, you did not ask him when he was going back to Houston or where he was going from there?
A No, sir. He didn't ask me, either.
Q Did you know without asking him where he was going?
A No, sir.
Q He left you without your knowing it?
A More or less. I was kind of half asleep.
Q And that was approximately what hour, Mr. Hoker, if you know?
A There is no way to tell you.
Q Sometime, apparently, in the early morning hours of the 15th?
A I couldn't say that, either.
Q You do know what date it was?
A Yes, sir.

THE COURT:

I think you know that you have objections. *I tried to ask innocuous questions.*

MR. TATUM:

I do want to place a standing objection to continued interrogation by the court to which the defense may not have ample opportunity to object. We feel that it does bias the jury and there is no cure for it. Respectfully submitted." (Emphasis added)

The brief of the United States, at page 5, in comparing this case with *Lanham,* asserts: "In the case at bar, the court asked Hoker only 51 questions as opposed to the 94 asked by defense counsel and 313 asked by the prosecutor. No other witness was examined by the court and the court called no witnesses of its own."

This statement is incorrect in every particular save its assertion that the court called no witnesses of its own. The number of questions of the appel-

Q Were you in bed when he left?
A Yes, sir.
Q You cannot be any more specific than that?
A No, sir.
Q Now, the 15th, what time of day was it that you registered, Mr. Hoker?
A On the 15th, I imagine it was right around two or 3:00.
Q In the afternoon?
A Yes. As a matter of fact, the manager called and said that we were going to have to reregister if we were going to stay there that night.
Q Had your friend left by that time?
A Yes, sir.
(171) Q You were alone?
A Yes, sir.
Q And I take it you walked from your room over to the motel office and signed in?
A Yes, sir.
Q Paid them?
A Yes, sir.
Q In cash?
A Yes, sir.
THE COURT:
Anything else?
Mr. Alfaro:
A couple of questions.

lant asked by the court was 153, by our count, not 51, although there may be some mis-attribution by the court reporter.[10] The tenor of the court's questions rather than their bare number is the more important factor. One would be hard put to conceive a more inaccurate or inapt characterization than the trial judge's reference to his questions as *innocuous*. (quoted, supra).

As we said in Hunter v. United States, supra:

> "The assignments of error based on the district judge's cross-examination of appellant are in our opinion well taken. While that method of cross-examination, if it had been conducted by the district attorney, might have been proper, a district judge ought never to assume the role of a prosecuting attorney and lend the weight of his great influence to the side of the government. It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it, in the interests of justice, that the case is fairly tried."

The exact number of questions by the defense counsel and by the assistant U.

S. Attorney prosecuting is less significant, but here again we do not find record support for the figures given by the brief of the United States of 94 questions by defense counsel and 313 by the government attorney. Our count is respectively 91 and 411 questions. Further, mainly for clarification of their testimony, the court interrogated briefly several other witnesses, both government and defense.[11]

But the brief and cursory questions put to other witnesses tended the more strongly to emphasize to the jury that the judge's concern with credibility, indeed his expressed doubts as to credibility, were limited to the defendant. This refutes the comment in the government brief at page 6:

> "In Hunter v. United States, 62 F. 2d 217 (C.A. 5, 1932), this court found reversible error in *the trial judge's severe cross-examination of the defendant* and his lengthy comments on defendant's credibility without comments on the credibility of the state's witness. Such one-sidedness was not present in the case at bar."

Further parallel exists between this case and *Hunter* in that in the present case also the charge to the jury centered on Hoker's credibility without questioning that of the government witnesses.[12]

---

10. Such confusion was eminently possible. The questions of both court and government attorney were marked by similar prosecutorial zeal, and often as well by thinly veiled intimation of disbelief.

11. At one point in the cross-examination of Mr. McManus, the U.S. Customs Inspector, a question was propounded regarding a conversation with Martinez, who reportedly said he had formerly owned the Chevrolet truck and sold it to a man in Dallas: "Did he tell you the man's name?" The court interrupted to inquire of government counsel, "Are you going to object to hearsay, Mr. District Attorney?", but was told that the testimony was not objectionable to the government. This incident, perhaps trivial in itself, indicates a degree of court willingness to intercede in the conduct of a trial ordinarily not manifested.

12. The jury instructions, insofar as they touched on the testimony, were as follows:

> "Now, what are the facts in the case? You heard it all yesterday afternoon and today elicited from the witnesses by the lawyers, and I do not purport to dwell on it at length.
>
> The government's case tends to show that the young man came across the bridge in an old, 17 or 18-year-old vehicle, alone, no luggage. The inspector at the primary station where he asked 'are you an American Citizen, what are you bringing from Mexico', almost immediately became suspicious and referred the vehicle to secondary. The young man was examined. Nothing was found in his pockets or in his personal effects—no contraband, I mean. But it was apparent that the vehicle had at least one or more secret compartments. They

What we noted in *Hunter*, supra, applies with equal force to the situation in the trial below:

"The judge's charge was not as objectionable as was his cross-examination of appellant, but it was erroneous in that it was one sided, and placed undue emphasis on the testimony of appellant which the judge himself had brought out by his questions. If the trial judge com-

put it up on a hoist or lift and took it apart and the evidence shows six secret compartments loaded with marijuana.

The young man, when he learns that the (192) vehicle is to be dismantled or carefully searched, states or asks of the customs officer there, as I understood his testimony, 'Will it go harder for me if they find hard stuff in there than if it is only grass?' or possibly "Weed" was the word. He did not use "Marijuana" as I recall it, but if it is just grass or just weed.

He denied any knowledge of the contraband in the vehicle. He has testified in his own behalf as a witness. Briefly, his testimony, as I recall it, was that he is a young man who had a good job and worked for a good company in Houston. He left of his own accord and before going back to work in a new position, he decided to take a vacation.

When interrogated as to why a young man of that age would take a vacation of this sort alone, wouldn't it have been more fun if he had a friend or buddy to accompany him, his answer was that this roommate got married and the defendant decided to come down by himself.

He hitchhiked, he brought no luggage except one T-shirt. He hitched a couple or three rides and got to Laredo. He walked most of the way, I believe he said, from the highway intersections north of the city down to the bridge, paid his fare (193) and walked across the bridge and walked a quarter or half-mile south where he again was hitchhiking and purely by coincidence and accident the man that picked him up was a man from Houston whom he had gone to church with and apparently knew fairly well, at least from that source. They go to the motel and take a room. There has been much argument from the lawyers as to whether or not the defendant testified truthfully and accurately about his registration and when he registered and what room he was in and if he tried to secret the fact that this friend was with him and if so, why. All of which I leave to you in your own weighing and consideration of your testimony.

In any event, he is caught at the bridge, his reason or his explanation was that he had met a stranger in the bar the second night, as I recall it. The acquaintance came about simply because they were sitting at the same table having drinks and the defendant commented that he was about out of money and the friend said, 'I will give you a job, you can make $200. I have a truck I want driven to Houston.' Without further discussion or inquiry, as I understood it, they made a deal.

So, as I see the evidence, the real question for you ladies and gentlemen to decide is (194) that of knowledge.

Without in any way undertaking to tell you what you should determine, it seems to me you might consider first whether any portion of the defendant's testimony about the trip is accurate, whether perhaps he may have come down with Sparks with the express purpose of bringing back a load of marijuana, whether his luggage may not have been in Sparks' car the whole time and that is why it was not with him when he was caught.

Second, is his testimony accurate insofar as the method of his coming, meeting the stranger in the bar and if so, whether circumstances surrounding the arrangement for the defendant to drive the truck back, were they such that he must have known in his heart that he was bringing contraband back across the river.

On the other hand, is his testimony true that he had no knowledge and that the circumstances were not such that he actually knew in his heart that he was doing anything wrong.

I instruct you that knowledge in the sense that I have defined it to you is an essential element. The government must prove it beyond a reasonable doubt. If you have a reasonable doubt, (195) you should acquit. If you find beyond a reasonable doubt that he did what he did, driving the truck with the marijuana in it, and that this was done knowingly and intentionally and that he had it in his possession with the intent to distribute it knowingly and intentionally, if you so find beyond a reasonable doubt, then it would be your duty to convict."

ments on the evidence, as he has a right to do so, he should call attention to the evidence in favor of as well as that against the accused. O'Shaughnessy v. United States (C.C.A.Ala.) 17 F.2d 225. That the district judge did not intend to be unfair is beside the question. The case was tried in such a way that the jury, in considering as a whole the judge's questions and charge, might well have reached the conclusion that he was not impartial, but was insisting upon a conviction. It is vastly more important that the attitude of the trial judge should be impartial than that any particular defendant, however guilty he may be, should be convicted. It is too much to expect of human nature that a judge can actively and vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial."

█ We think we have written enough to reflect our conclusion that the trial judge formed an opinion that the appellant was lying and set out to demonstrate that this was so. The position of a trial judge carries such overpower-ing weight before a jury that we can not be certain that the verdict was that of the jury uninfluenced by a desire to bring in a verdict calculated to please the judge. No amount of boiler plate instructions to the jury—not to draw any inferences as to the judge's feelings about the facts from his asking questions, or that they are free to disregard factual comment by the judge, or as to the presumption of innocence—could be expected to erase from a jury's mind the part taken in this trial by the district judge.[13] Hoker is entitled to be retried in an atmosphere where the impartial neutrality of the presiding judge is not open to serious question.

As to the further issue appellant raised on appeal, the trial judge's refusal either to permit defense counsel to question the prospective jurors with reference to prior service in criminal cases, or to propound such questions himself, we suggest simply that the voir dire examination was rather severely restricted, and that more latitude should be allowed upon retrial. This point standing alone would probably not rise to the lev-

---

13. We reproduce the court's jury instructions in these respects:

In this court, I should tell you, too, that the judge is permitted, if he elects to do so, to comment upon the evidence, by that, I mean I am allowed to tell you what I think about the witnesses (185) or their credibility or what I think the facts are, or even to tell you what verdict I think you should return. I have no expectation of doing that, but I instruct you now, that if from the course of my remarks, you draw some feeling as to my own—you draw some conclusions or inferences as to my feelings about the facts of the case, I do not intend it as an effort to tell you or to direct you as to what your verdict should be. Anything I say about the facts or about the credibility of the witnesses is intended only to be of help to you in your consideration. It is not binding on you in any respect, and you are at perfect liberty to disregard anything I say about the facts or the witnesses or their credibility.

The law of the case you will take from the Court's Charge and be governed thereby.

Incidentally, and in connection with that same matter, I will instruct you that in the course of the examination of the witnesses I have seen fit to ask certain questions of certain witnesses. I do that on occasion when I think that certain matters need to be further explored, in areas that perhaps the lawyers have not touched. You should not draw any inference or conclusion about my feelings about the facts of the case because I chose to ask certain (186) questions of witnesses. But you should simply consider the answers made in the light of any other answers made and give the testimony of that witness in that regard such credit as you think it is entitled to.

Now, this defendant, ladies and gentlemen, as is true of every defendant brought to trial in this court, is presumed at the outset to be innocent. The defendant starts off with a clean slate, and by pleading not guilty as he has done here, has imposed upon the government the burden of proving his guilt beyond a reasonable doubt.

In another setting, these charges would be unobjectionable.

el of reversible error, and requires no discussion in this opinion. The exact situation presented is unlikely to recur in the trial of this or another case.

Reversed.