**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gurleon Maxi JACKSON, Talmadge Alvin Whitley and Nathan Phillip Hicks, Defendants-Appellants.**

No. 82–2158.

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1983.

Rehearing Denied March 23, 1982.
Rehearing and Rehearing En Banc Denied March 28, 1983.

Horacio L. Barrera, Brownsville, Tex., for Jackson.

Roland E. Dahlin, II, Federal Public Defender, George McCall Secrest, Jr., Antonio Balderas, Jr., Asst. Federal Public Defenders, Houston, Tex., for Whitley.

L. Aron Pena, Edinburg, Tex., for Hicks.

Daniel K. Hedges, U.S. Atty., John M. Potter, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

WISDOM, Circuit Judge:

This appeal involves a sting operation conducted by agents of the Drug Enforcement Administration (DEA). The operation resulted in jury convictions of the defendants, Jackson, Hicks, and Whitley of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976). The jury also convicted Jackson of knowingly and intentionally using a communications facility in furtherance of a conspiracy to possess cocaine with intent to distribute. Each defendant has appealed his conviction.

### Facts

Sometime in September 1981, Joyce and David Langley approached a Drug Enforcement Administration (DEA) Agent, C.T. Westmoreland, in south Texas and asked him for a job flying DEA aircraft. Instead of offering a flying job, Westmoreland offered to pay the Langleys for the names of persons involved in cocaine smuggling. Mrs. Langley put Westmoreland in contact with the defendant Gurleon Maxi Jackson. Mrs. Langley received $6,000 for her participation in the operation.

On October 14, 1981, DEA Agent Tony Tamayo, posing as a Mexican official dealing in drugs, met with Jackson in Matamoros, Mexico. At the meeting, Jackson told Tamayo that he was interested in finding someone to supply him with 10 kilograms of cocaine on a monthly basis. The two agreed on a price and place of delivery. On November 24, 1981, Tamayo phoned Jackson at a hospital in Mobile, Alabama and agreed to supply the cocaine by the end of November.

On November 25, 1981, Celestino Oliveira, a Brownsville, Texas police officer connected with the operation, telephoned Jackson as a representative of Tamayo. Jackson and Oliveira discussed the details of the exchange of the cocaine for money. After several more conversations, Oliveira met with Jackson at the Ramada Inn in Brownsville on November 29, 1981. At this meeting, Oliveira devised a plan for the actual execution of the exchange. For security reasons, Jackson and Oliveira decided to meet in a nearby Sambo's restaurant. Jackson would bring the cash to pay for the drugs and Oliveira would bring the drugs. While Oliveira and Jackson waited in the

restaurant with the money, their accomplices would return to the Ramada Inn and test the drugs for purity. After Jackson's unnamed accomplice satisfied himself of the cocaine's purity, Oliveira could take the money.

After Oliveira and Jackson agreed on this plan, Nathan Hicks entered the motel room from an adjoining room and gave Oliveira an envelope containing $60,000 in cash. Oliveira counted the money. The three men then went to Sambo's. There, the envelope was placed on an empty chair at the men's table and was covered with a cowboy hat. Oliveira left the restaurant and instructed DEA Agent Thomas Lentini to enter the restaurant after a lapse of thirty minutes and indicate that the cocaine had arrived. Oliveira reentered the restaurant and joined Jackson and Hicks. After thirty or forty minutes Lentini arrived and delivered his message. At that point, Hicks went to a telephone and made a phone call. The content of the phone call was not disclosed at trial. Shortly after the phone call, Talmadge Whitley entered the restaurant, and took a seat at the table. Lentini and Hicks left the restaurant, presumably to pick up and test the cocaine. Both men were arrested outside the restaurant.

After about seven minutes, federal agents entered the restaurant and arrested Jackson, Whitley, and Oliveira. Between the time of Whitley's arrival at the restaurant and the time of the arrest, Whitley apparently did not speak to the other men despite attempts by Oliveira to engage him in conversation. During that time, Whitley did seem very watchful of the comings and goings in the restaurant, constantly turning his head from left to right.[1]

After his arrest, Hicks indicated that two other individuals were involved in the case and that they might be armed. Agents immediately went to the two rooms in the Ramada Inn where Oliveira, Jackson, and Hicks had met in the earlier meeting. Before entering the rooms, they encountered and arrested two suspects fitting the description given by Hicks.[2] The agents entered the room in which Oliveira and Jackson had previously met and saw no contraband. The agents then went through a door, slightly ajar, connecting the first room with the room from which Hicks had come at the earlier meeting. The second room contained several items used in the testing of cocaine[3] and a handgun. All the contraband was in plain view. The room was registered in Hick's name.

The jury found all the defendants guilty on all counts charged. The court sentenced Jackson, Hicks, and Whitley to six years, six years, and three years, respectively.

### Whitley

Whitley's only contention on appeal is that the evidence presented at trial was insufficient, as a matter of law, to convict him. Whitley argues that the government has failed to prove that he "knew of a conspiracy, joined a conspiracy or did anything in furtherance of a conspiracy". According to Whitley, the government's evidence showed only his presence in Sambo's. Nevertheless, the jury found Whitley guilty of conspiring to possess cocaine with the intent to distribute.

 We must, of course, give deference to the findings of the jury. *United States v. White,* 5 Cir., 569 F.2d 263, 268,

1. Evidence offered at trial indicated that Whitley had hearing problems. Whitley's counsel argued that Whitley's disability explained his failure to respond to Oliveira's questions. Whitley's counsel also contended that Whitley's head movements were his attempts to hear and understand the conversation at the table.

2. The two suspects were Jackson's wife, Helen Jackson, and Nelson Renfrow. Both suspects were indicted along with the defendants in this case. Mrs. Jackson had her case severed from that of the other co-defendants. The trial court

granted Renfrow's motion for judgment of acquittal at the close of the government's case in chief.

3. The cocaine testing items were a set of scales, a chemical solution, a bottle of Clorox bleach, glass slides suitable for microscopic or laboratory work, a bottle labeled "Snow-Toker II Ultra Fast Drying High Yield Free-Base Solvent", a book entitled "The Pleasures of Cocaine", an electronic machine used to determine the melting point of chemical substances, a device for measuring the volumes of chemical solutions, and a glass vial with a rubber stopper.

*cert. denied,* 1978, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149. We must view the evidence presented in the case and the inferences that may be drawn from it in a light most favorable to the government and ask whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt". *United States v. Bell,* 5 Cir.1982, 678 F.2d 547, 549. "We will reverse only if a reasonably minded jury must necessarily have entertained a reasonable doubt of a defendant's guilt." *United States v. Vergara,* 5 Cir.1982, 687 F.2d 57, 60; *see also United States v. Galvan,* 5 Cir.1982, 693 F.2d 417, 419. Nevertheless, we must not hesitate to overturn a jury verdict when it is necessary to "guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt". *Estelle v. Williams,* 1976, 425 U.S. 501, 503, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 130. Juries must not be allowed to convict on mere suspicion and innuendo. *United States v. Littrell,* 5 Cir. 1978, 574 F.2d 828, 833. The test is whether the jury "could reasonably, logically, and legally infer from the evidence presented that the appellant was guilty beyond a reasonable doubt". *United States v. White,* 569 F.2d at 266.

■ In drug conspiracy cases, the government must prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it.[4] *United States v. Bright,* 5 Cir.1978, 550 F.2d 240, 242; *United States v. White,* 569 F.2d at 267. We have previously stressed that we will not lightly infer a defendant's knowledge and acquiescence in a conspiracy. *Id.* at 267; *United States v. Johnson,* 5 Cir., 439 F.2d 885, 888, *cert. denied,* 1971, 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161. The

government must show beyond a reasonable doubt that the defendant had the deliberate, knowing, and specific intent to join the conspiracy. *United States v. Galvan,* 693 F.2d at 419; *United States v. DeSimone,* 5 Cir.1981, 660 F.2d 532, 537, *cert. denied sub nom. Butler v. United States,* 1982, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149. A showing that the defendant merely associated with those participating in a conspiracy is insufficient. *United States v. Fitzharris,* 5 Cir.1980, 633 F.2d 416, 423, *cert. denied,* 1981, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847; *United States v. Littrell,* 574 F.2d at 833; *United States v. White,* 569 F.2d at 268. Similarly, the government cannot prove a conspiracy by presenting evidence that only places the defendant in "a climate of activity that reeks of something foul". *United States v. Galvan,* 693 F.2d at 419; *United States v. DeSimone,* 660 F.2d at 537.

■ Viewing the evidence in a light most favorable to the government, we have little trouble holding that a conspiracy existed and that Whitley was present while parts of the conspiracy were taking place. Beyond that, the evidence shows no criminal conduct on Whitley's part beyond a reasonable doubt. Although testimony at trial showed that Whitley joined Jackson and Oliveira in the restaurant, there is no evidence indicating that Whitley knew the nature or purpose of the meeting, or even that a large amount of money was present. The government has offered no evidence indicating that Whitley was present during conversations in which the conspiracy was discussed.[5] At the most, the evidence shows that Whitley associated with others who were involved with a conspiracy. That evidence is legally insufficient for a jury to infer, beyond a reasonable doubt, Whitley's

---

4. Unlike some criminal conspiracies, proof of an overt act in furtherance of a conspiracy is not necessary to establish a conspiracy in violation of the Drug Control Act, 21 U.S.C. §§ 841 & 846 (1976). *United States v. Kupper,* 5 Cir. 1982, 693 F.2d 1129, 1134; *United States v. Brown,* 5 Cir.1982, 692 F.2d 345, 348; *United States v. Rodriguez,* 5 Cir., 612 F.2d 906, 919 n. 37, *cert. denied sub nom. Albernaz v. United States,* 1980, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41.

5. At trial, Jackson testified that he had met with Whitley on several occasions and that he had seen Whitley with Hicks before the encounter in the Sambo's. Jackson stated that he never discussed drug transactions with Whitley. Jackson also did not know of Whitley's relationship with Hicks.

knowing and voluntary participation in a conspiracy to possess cocaine with intent to distribute. His conviction may not rest on mere conjecture and suspicion. *United States v. Fitzharris,* 633 F.2d at 423; *Vick v. United States,* 5 Cir.1954, 216 F.2d 228, 233.

### Hicks

On appeal, Hicks argues that the trial court committed several errors that require reversal. First, Hicks contends that the trial court should have found that the government's sting operation constituted entrapment as a matter of law. Failing that, Hicks argues that the court at least should have presented the entrapment issue to the jury. Second, Hicks maintains that the district court's extensive cross-examination of defense witnesses from the bench was unnecessary and resulted in undue prejudice to his case. Hicks's third complaint is that the trial court erred in admitting the drug testing paraphernalia seized in the warrantless search of his motel room. Fourth, Hicks contends that the trial court erred by labeling his wife's testimony regarding his purpose for going to Brownsville as hearsay. Finally, Hicks argues that the district court should have allowed him to present witnesses on his own behalf at the time of sentencing.

### A. Entrapment

■ The thrust of Hicks's entrapment argument is that the government lured him into the cocaine deal so outrageously that we should find entrapment as a matter of law. To support this contention, Hicks relies on his reputation as a successful businessman with no record of illegal conduct in the past. Because of temporary business setbacks, however, Hicks contends that he was unable to resist the pressure exerted and temptation to which he was exposed. According to Hicks, the government's scheme of trapping unwary businessmen, providing the means for the crime, and then encouraging them to commit the crime requires, at the very least, an instruction on the issue of entrapment. Hicks maintains that, having raised the issue of entrapment, the burden rests on the government to show that he was predisposed to commit the crime.

We have articulated the burden of production on a defendant in two recent opinions.

In this circuit, before the judge must instruct the jury on entrapment, a defendant must show (1) lack of predisposition to commit the crime *and* (2) some governmental involvement and inducement more than just providing the opportunity of facilities to commit the crime.

*United States v. Fischel,* 5 Cir.1982, 686 F.2d 1082, 1085; *United States v. Leon,* 5 Cir.1982, 679 F.2d 534, 538 (emphasis in original); *see United States v. Anderton,* 5 Cir.1982, 679 F.2d 1199, 1201; *United States v. Andrew,* 5 Cir.1982, 666 F.2d 915, 922–23. We need not decide whether the government did more than simply provide an opportunity for crime because Hicks has not shown a lack of predisposition on his part.[6] The evidence presented at trial, however, points to his predisposition to participate in the scheme to purchase cocaine.

Hicks initially communicated with Jackson about the possibility of making a drug deal.[7] Hicks travelled from his home in Zebulon, North Carolina to Brownsville, Texas to participate in the cocaine transaction. He then chartered an airplane in the Brownsville area and flew to Houston to pick up the cash to be used in the deal. Hicks was present at the Ramada Inn when

---

**6.** Hicks argues that the initial burden is on the government to show that he was predisposed toward joining the conspiracy.

**7.** The first meeting between Hicks and Jackson occurred when Hicks visited Jackson in the hospital in Mobile, Alabama on or about November 1, 1981. The record is unclear as to the extent to which the men discussed possible drug transaction. But Jackson's testimony at trial clearly showed that Hicks was interested in purchasing cocaine:

> [Jackson's Counsel]: While you were in the hospital, did anyone introduce you to somebody who might be interested in this deal?
> [Jackson]: Some people came to see me in the hospital the day I was going to be operated on, that morning.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Jackson's Counsel]: Do you remember who they were?

Jackson and Oliveira worked out the details of the exchange. This evidence shows that Hicks eagerly took an active role in each step of the exchange process. In light of this evidence, we hold that Hicks failed to make a showing that he was not predisposed to taking part in the conspiracy. Therefore, an instruction on the defense of entrapment was not warranted. Our holding on the need for a jury instruction precludes the need to consider Hicks's claim that he was entrapped as a matter of law.[8]

### B. Questions From The Bench

On several occasions during the trial, the court interrupted the questioning of de-

> [Jackson]: I remember one gentleman, yes, sir.
> [Jackson's Counsel]: Who was it?
> [Jackson]: Stumpy Hicks.
>
> \* \* \* \* \* \*
>
> [Jackson's Counsel]: Do you remember the substance of that meeting?
> [Jackson]: I don't even remember a conversation. I vaguely remember somebody coming to my room. I was in isolation.
>
> Record, at 496.
>
> The Court: What did you and Mr. Hicks talk about in the hospital?
> [Jackson]: In the hospital I can't—I remember talking to Mr. Hicks in the hospital. I did talk to Mr. Hicks prior to him coming to the hospital.
> The Court: What did you talk about then?
> [Jackson]: When he called me?
> The Court: Yes.
> [Jackson]: We talked about electronics business down here, and he asked me if he could meet Mrs. Langley in Brownsville, that Fred had told him about.
> The Court: Wait a minute. Electronics doesn't have anything to do with cocaine.
> [Jackson]: Mr. Hicks and I both talked about the electronics business. He asked me about the business down in Brownsville, what sort of business it was, what you do. He was— he appeared that he was interested in the business, in the electronics.
>
> \* \* \* \* \* \*
>
> The Court: I say, was there anything significant about these folks visiting you in the hospital other than just going there to see how you were doing?
> [Jackson]: No, sir, these folks came specifically to visit me.
> The Court: For what purpose, just to see you?
> [Jackson]: I suppose to talk to me about the business in Brownsville.
> The Court: What business?

fense and government witnesses to pose questions from the bench. Hicks argues that, since the attorneys were performing competently, the trial judge should not have interfered with their questioning. According to Hicks, such intervention is error unless questions from the bench are needed to clarify a witness's testimony. He contends that not only were the district court's questions unneeded to clarify testimony, the questions prejudiced the jury against his case.[9]

A trial court judge has a difficult task. He must insure that evidence is

> [Jackson]: Cocaine business and the smuggling business.
> The Court: Who were the people that came to you about the cocaine business?
> [Jackson]: Mr. Hicks, Mr. Stumpy Hicks.
> The Court: That's what I am trying to find out. All right. Go ahead.
>
> Record, at 498–500.

8. The government also argues on appeal that Hicks was not entitled to an entrapment instruction because he failed to submit a written request for such an instruction as required by Fed.R.Crim.P. 30. Because of our holding on the entrapment issue we need not discuss the technical shortcomings in Hicks's contention.

9. The questioning that Hicks principally complains of is that contained in footnote 7. Hicks also assigns error to other questioning of Hicks's co-defendant Jackson, including the following exchanges:

> The Court: You're not testifying Mr. Jackson that you were doing this with the hope, with the idea of turning somebody over to the police, that's not your testimony, is it?
> [Jackson]: Judge, I was looking into it with the possibility that I would report it to customs.
> The Court: Well did you ever decide you were going to do that?
> [Jackson]: If I could determine if Tony was for real, I would. If he was actually selling drugs as a Mexican government official to people in the United States, I would have, yes sir.
> The Court: A moment ago you said if this deal went through you were going to do what now?
> [Jackson]: Report it to customs, if this was for real, if Tony was a Mexican federal agent and they were selling drugs across the border into the United States, I would definitely turn this into customs.

presented to the jury fairly and completely, but he also must be above even the appearance of partiality. *Moore v. United States,* 5 Cir.1979, 598 F.2d 439, 442. "It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it in the interests of justice, that the case is fairly tried." *United States v. Hoker,* 5 Cir.1973, 483 F.2d 359, 366; *see United States v. Daniels,* 5 Cir. 1978, 572 F.2d 535, 541; *Manchack v. S/S Overseas Progress,* 5 Cir.1975, 524 F.2d 918, 919. But the judge acts as an administrator of the trial, not just a moderator. *Id.; Curd v. Todd-Johnson Dry Docks,* 5 Cir. 1954, 213 F.2d 864, 866.

> [The judge] may elicit further information [from a witness] for the benefit of the jury, and he may comment on the

evidence, provided he makes it clear that all matters of fact are committed to the jury's ultimate determination. *United States v. Cisneros,* 491 F.2d 1068 (5 Cir. 1974), citing *Querica v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933).

*United States v. Davis,* 5 Cir.1977, 546 F.2d 617, 622. In short, the trial judge may participate in a trial by questioning a witness so long as he maintains an atmosphere of neutrality. *See Moore v. United States,* 5 Cir.1979, 598 F.2d 439, 442.

▮ We hold that the trial judge here conducted the trial in an evenhanded and neutral manner. In every case, the court's questions were designed to fill gaps in a witness's testimony or clear up confusion caused by the witness. The court's invita-

> The Court: You were going to turn Mr. Hicks and Mrs. Langley and all of these people in?
> [Jackson]: Yes sir, I most definitely would have.
> The Court: Let them all go to jail?
> [Jackson]: I would have let my contact with customs handle it. Done whatever he asked me to do.
>
> Record at 507.
>
> The Court: Wait a minute, if I understand you correctly Mr. Jackson you're not claiming that you were induced to commit this offense to make some money or you were not talked into it by any agent to make some money but rather that you did it because you were trying to catch a criminal who you were going to then turn over to the federal authorities, is that what you are saying?
> [Jackson]: That's not it completely sir.
> The Court: Is that what you are saying in part?
> [Jackson]: I would make some money if this merchandise was transported and that I felt like I could make some money.
> The Court: How was it you felt you could make some money? Who was going to give you the money?
> [Jackson]: When I talked with Tony [Tamayo], when I talked with Tony down in Matamoros I told him my background my flying and he said that they would be very interested in me and I could make some money transporting it for them.
> The Court: Why is it that you claim you are not guilty of this charge?
> [Jackson]: Sir, I'm not guilty of this charge.
> The Court: Why are you not guilty? Tell me why you are not guilty?
> [Jackson]: I was trapped in this charge, I was sucked into this thing, I was lead to

> believe that David and Joyce [Langley] were working for Mr. Westmoreland.
> The Court: And you knew he was a government agent?
> [Jackson]: Yes, I knew he was a government agent.
> The Court: So what you are saying is that you knew that all of these people were government agents, including Joyce, to some degree, a government agent.
> [Jackson]: Yes.
> The Court: Or at least working under government sponsorship?
> [Jackson]: Yes sir.
> The Court: So you knew right off the bat?
> [Jackson]: No sir, I did not know it right off the bat. From what Joyce and David had told me, their prior association with Mr. Westmoreland, I figured that they were. I figured Joyce was working with Mr. Westmoreland.
> The Court: When did Joyce tell you that? When did David tell you that?
> [Jackson]: That they knew Mr. Westmoreland?
> The Court: Yes, and Mr. Westmoreland was a D.E.A. agent?
> [Jackson]: This is when I first came down here to fly electronics.
> The Court: Before this cocaine thing ever came up?
> [Jackson]: Yes sir.
>
> Record at 521. Other judicial conduct that Hicks challenges is the trial court's questioning of the paid informant and her husband and the court's reminding the informant that she was under oath.

tion to Jackson to explain his plea of not guilty [10] actually worked to the defendant's benefit by allowing Jackson to interject the issue of entrapment into the case. The tenor of the court's questions was inquisitive rather than accusatory. Moreover, the court did not limit its questions to defense witnesses. On several occasions the court interupted the examination of a government witness to ask questions meant to clarify the witness's testimony. *See, e.g.,* Record at 26, 64, 97, 107, 137, 257–58. Finally, the court lessened the potentially prejudicial effect of its questions by instructing the jury that it, not the court, was the sole fact-finder in the case. The court also instructed the jury that none of the court's questions or comments during the trial should be interpreted as an opinion of the court regarding guilt or innocence.[11] In light of all these factors, we hold that the trial court did not err in its questioning of witnesses.

### C. *Warrantless Search*

At the time Hicks was arrested, he said that two more people were involved in the transaction and that they were armed. One of the arresting agents radioed other agents that *at least* two more suspects might be found at the Ramada Inn and that the suspects had a gun. The other agents went to the motel room where the drug exchange had been planned. The agents spotted a man and a woman outside the motel room fitting the description given by Hicks and arrested them. Following the arrest, the agents immediately conducted a cursory search of the two rooms involved in the prior meeting. The purpose of the search was to look for others who might have been involved in the cocaine deal. During the search the agents found the drug testing paraphernalia and a pistol in plain view. The trial court admitted the evidence finding that the agents had a right to search the rooms for other members of the conspiracy. Hicks contends that this evidence is the fruit of a warrantless search and should not have been admitted at trial.

■ In *United States v. Sheikh,* 5th Cir. 1981, 654 F.2d 1057, *cert. denied,* 1982, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852, we reiterated the rule regarding searches following an arrest of nearby premises:

Arresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest—even if the arrest is near the door but outside the lodging—where they have reasonable grounds to believe that there are other persons present inside who might present a security risk. *See United States v. Diecidue,* 603 F.2d 535, 558–59 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (security search of house); *United States v. Bowdach,* 561 F.2d 1160, 1168–69 (5th Cir.1977) (security search of apartment).

*United States v. Sheikh,* 654 F.2d at 1071. Once the officers are legally inside the lodging, any evidence or contraband that is in plain view is subject to seizure and may be admitted into evidence. *Harris v. United States,* 1968, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069.

■ Hicks does not contend that the evidence in question was hidden from the view of the searching agents. He maintains, however, that after the arrest and

---

**10.** *See* note 9.

**11.** In its charge to the jury, the district court stated, in part:

Now, during the course of this trial I have had occasion to make comments, to rule on evidence. I have sustained objections. I have overruled objections. I have asked questions of witnesses during the trial. I may have admonished a witness about the manner of testifying or explained something to a witness. Don't assume from anything I have said or done that I have an opinion one

way or another as to the guilt of these defendants, because it was not my intention to convey that impression.... So it is not my purpose to infringe upon your responsibility by telling you how to decide this case. That's not my job. I wouldn't appreciate it if you were to tell me what the law is, and I am not going to tell you what the facts are, you see. That's your job, and you are the ones who have taken an oath to render a true verdict in this case.

Record at 633–34.

restraint of the two suspects, the agents had no reason to enter the motel room without taking the time to get a search warrant. We disagree.

The agents at the motel had observed the suspects leaving the room in which the agents later discovered the evidence. They had no way of knowing that the two suspects were the only remaining people involved in the exchange. Although Hicks had said that the suspects were armed, a pat-down search following the arrest did not reveal a weapon. Thus, the agents had reason to believe that a gun was somewhere in the motel. It is clear to us that the cursory search of the motel rooms resulted from the agent's reasonable belief that an immediate security sweep of the premises was required for their own safety and the safety of others at the motel.

### D. *Hearsay*

Another argument that Hicks presents on appeal is that the trial court erred by not allowing Hicks's wife to testify about his planned business dealings in Brownsville.[12] The court ruled that the testimony was inadmissible hearsay. On appeal, Hicks argues that the testimony is not hearsay under Fed.Rule of Evidence 801(c) because it was not offered for the truth of the matter asserted.[13] Instead, Hicks contends that the testimony was offered as a means of bolstering his entrapment defense by showing his state of mind before he left for Texas. In the alternative, Hicks contends that the testimony shows "prior consistent statements to defend implications of fabrication".

 We need not decide whether Hicks's arguments on appeal are valid, because he did not make these arguments to the district court. The only reason given at trial for the admission of the testimony in question was the need to inform the jury of Mrs. Hicks's understanding of Hicks's motive in going to Texas,[14] i.e., the truth of the matter asserted. Hicks did not argue at that time that the hearsay fell within any of the numerous exceptions to the hearsay rule. He has pursued his other arguments for admission of the testimony only at the appellate stage. We have long held that, absent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court. *Higginbotham v. Ford Motor Co.,* 5 · Cir.1976, 540 F.2d 762, 768 n. 10; *Capps v. Humble Oil & Refining Co.,* 5 Cir.1976, 536 F.2d 80, 81–82; *Wolf v. Frank,* 5 Cir., 477 F.2d 467, 474–75, *cert. denied,* 1973, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218. We see no manifest injustice in this case.

12. Outside the presence of the jury, Mrs. Hicks gave the following testimony:

> [Hicks's Counsel]: At the time Mr. Hicks did leave for Texas, did he tell you what he was coming down here for?
> [Mrs. Hicks]: Yes.
> [Hicks's Counsel]: What was that?
> [Mrs. Hicks]: He said that Mr. Jackson had offered him an opportunity to invest in an electronics deal, that being a heating and air-conditioning dealer for General Electric, he could purchase or go into the appliance business, also, and purchase, say, T.V.s.
> [Hicks's Counsel]: Was your husband seeking any new markets of any kind?
> [Mrs. Hicks]: Yes, the electronics market. In fact, he was trying to raise money from our friends, and I know from our—he drew money from the business to invest towards this market.
> [Hicks's Counsel]: Did you have an idea he might get into the purchase of drugs from Mexico?

> [Mrs. Hicks]: Absolutely not. I know it was his original intent to check into the possibility of the electronics.

13. *See United States v. Parry,* 5 Cir.1981, 649 F.2d 292, 295; *United States v. Bobo,* 5 Cir. 1978, 586 F.2d 355, 371–72, *cert. denied sub nom. Rowan v. United States,* 1979, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795.

14. The colloquy between the trial court and Hicks's counsel regarding the excluded testimony was:

> [Hicks's Counsel]: That's the evidence, Your Honor, we would like to offer to the jury.
> The Court: Because that's what he told you?
> [Mrs. Hicks]: Yes, sir.
> [Hicks's Counsel]: It's for the purpose of what she understood the truth to be.
> The Court: I will abide by my original ruling. You may step down, Mrs. Hicks, and you may go have a seat.

### E. *Allocution*

■ Hicks's final contention on appeal is that the district court erred in not allowing Mrs. Hicks to address the court at sentencing. Hicks argues that the requirement in Fed.R.Crim.P. 32(a)(1) that a defendant be given the opportunity to present information in mitigation of punishment gives him the right to present witnesses in his own behalf. Hicks has cited no cases that have recognized such a right and we are aware of none. Moreover, the broad construction of Rule 32(a)(1) Hicks urges would not further any recognized interests of justice. As pointed out in Moore's Federal Practice, the right of allocution has survived "more for its therapeutic effect on the defendant than its practical effect on the judge's determination". 8A Moore's Federal Practice ¶ 32.05 (1982). The defendant must be given the chance to inform the court of any mitigating circumstances, but we see little advantage to be gained by allowing the defendant to have others testify for him at sentencing. In fact, such a judicial extension of the right of allocution would amount to a trial of the defendant's character following the trial of his guilt. We refuse to allow that extension. The trial court gave Hicks the opportunity to speak, and he spoke on his own behalf. We hold that the trial court adhered to Fed.R. Crim.P. 32(a)(1).[15]

### *Jackson*

■ Jackson presents two arguments on appeal. First, he contends that the district court should have instructed the jury on the issue of entrapment. Jackson maintains, as did Hicks, that the evidence of the DEA's conduct in this case was sufficient to require an entrapment instruction. Unlike Hicks, however, Jackson produced some evidence at trial that he was not predisposed to join an illegal conspiracy. According to Jackson, he went to Brownsville only to learn if the parties to the exchange really planned to purchase cocaine. He maintains that, following his discovery of any illegal activity, he would have reported the smuggling operation to the DEA. If Jackson's story is true, he was predisposed to uncover a smuggling ring, not to commit a crime.

Nevertheless, Jackson failed to make the other essential showing that must accompany a request for an entrapment instruction; he has failed to show "some government involvement and inducement more than just providing the opportunity or facilities to commit the crime". *United States v. Fischel,* 5 Cir.1982, 686 F.2d 1082, 1085. The important inquiry is whether there is any evidence that the government's conduct created a substantial risk that a person, other than one who is ready to commit it, would commit the offense. *United States v. Webster,* 5 Cir.1981, 649 F.2d 346, 349 (*en banc*); *United States v. Hill,* 5 Cir.1980, 626 F.2d 1301, 1303; *Pierce v. United States,* 5 Cir., 414 F.2d 163, 168, *cert. denied,* 1969, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425. To create a substantial risk, however, the government conduct must include an element of persuasion or mild coercion, such as fraudulent misrepresentations, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy, or friendship. *United States v. Hill,* 626 F.2d at 1304 & n. 4; *cf. United States v. Fischel,* 5 Cir.1982, 686 F.2d 1082, 1085.

We see no evidence of improper government inducement in this case. Although Jackson's brief states that Mr. and Mrs. Langley testified that they "encouraged" and "induced" Jackson,[16] a close reading of

---

**15.** We note in passing that had the trial court deprived Hicks of his right of allocution, the proper remedy would have been to remand to the district court for resentencing. 8A Moore's Federal Practice ¶ 32.05 (1982). Thus, even if Hicks's argument prevailed, we would not vacate his conviction.

**16.** The only evidence of inducement in the record is the statements of Mr. & Mrs. Langley

that they told Jackson on several occasions that there was "nothing to worry about". The Langleys were aware at the time they spoke to Jackson that he was involved in a government sting operation. Although these statements appear on their face to be fraudulent misrepresentations, a degree of misrepresentation is inherent in such an operation. In almost every case involving possible entrapment a government agent or representative must portray him-

the record reveals that they did no more than offer him the chance to buy cocaine. That activity alone is insufficient to require an entrapment instruction. *See United States v. Hill,* 626 F.2d at 1304–06. The trial court did not err in refusing Jackson's request.[17]

Jackson's second argument is that the trial court's questioning of him when he took the stand overstepped the bounds of judicial discretion. In particular, Jackson assigns error to the questions quoted in footnote 9. We have dealt with the judge's conduct at trial in our discussion of Hicks's contentions on appeal. Our holding applies equally to Jackson. We see no impropriety in the trial court's questioning of Jackson.

### Conclusion

We REVERSE Whitley's conviction because of the absence of any evidence that he had specific knowledge of the conspiracy to possess cocaine with intent to distribute. We AFFIRM the convictions of Hicks and Jackson.

self as something he is not—a criminal. If we held that this sort of misrepresentation is improper government inducement, we would invalidate virtually all undercover police operations. We refuse to allow that result. *Accord United States v. Russell,* 1973, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373–74.

17. Because of our finding of no egregious government conduct, we need not address the question whether Jackson could claim entrapment without admitting that he intended to commit the crime.