# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
July 22, 2020
Lyle W. Cayce
Clerk

No. 18-70011

Erica Yvonne Sheppard,

*Petitioner — Appellant,*

*versus*

Lorie Davis, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent — Appellee.*

Appeal from the United States District Court
for the Southern District of Texas
No. 4:14-CV-655

Before King, Smith, and Haynes, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

A jury found Erica Sheppard guilty of capital murder and sentenced her to death. She applied for a federal writ of habeas corpus, claiming that the state violated her rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), and that her attorney rendered ineffective assistance of counsel in neglecting to

No. 18-70011

object to certain comments by the trial judge and the prosecution and in failing to present sufficient mitigating evidence at the punishment phase. The district court denied her petition, concluding that the relitigation bar of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") foreclosed relief. We affirm.

I.

In 1993, Sheppard and James Dickerson noticed a parked vehicle belonging to Marilyn Meagher with its trunk open. Short on cash, they decided to enter the nearby apartment, "rob whoever was in[side] . . . , and steal the [vehicle]." Upon encountering Meagher, Sheppard tackled and restrained her as Dickerson held a knife to her throat. Although Meagher begged for her life—pleading that she had two children—Dickerson began to slash at her neck. When the blade proved too dull to cut, Sheppard retrieved a butcher's knife from the kitchen and handed it to Dickerson. As Meagher continued to gasp for air, Sheppard held her in place while Dickerson repeatedly pummeled her with a statuette. Meagher's daughter found her mother's body later that evening in a pool of blood.

Sheppard confessed and was tried for capital murder. At trial, she objected that the prosecutor had used a peremptory challenge to strike venire member Ronnie Simpson because he was black. The prosecutor justified the strike because Simpson had indicated that he would have trouble giving the death penalty based solely on the facts of the crime and would consider, as a mitigating factor, whether a defendant had children. Moreover, the prosecutor explained that, as a victim of a false arrest, Simpson appeared sympathetic to Sheppard's plight. In fact, Simpson "shifted over, looked at [Sheppard], and said hello" but did not extend the same cordiality to the prosecution.

Sheppard responded that the prosecution's reasons were pretextual

because it had accepted two similarly situated white jurors. Specifically, Larry Chambers acknowledged that "[i]t would be hard" to impose the death penalty on the facts of the crime alone, especially where the defendant did not personally murder the victim. Chambers also voiced concern about sentencing to death a young mother with children. David Herd stated that his son had been prosecuted for an incident with his girlfriend, which, in Herd's view, did not warrant a felony charge and proved to be "quite an ordeal" for his family.

The trial court took judicial notice of the fact that two of the selected jurors were black and that the state had exercised only three of its nine peremptory challenges against black venire members. It therefore overruled Sheppard's objection.

During voir dire, the judge instructed one venire panel that, under Texas's law of parties, each party to an offense "should be equally responsible as to punishment." Sheppard raised no objection. One of the members of the venire panel ultimately served as a juror, and another sat as an alternate.

The prosecutor remarked to three venire members during voir dire that Texas "do[es] not have life without parole" and that Sheppard would likely have to serve a minimum of thirty-five years before being eligible for parole. He noted, however, that a defendant previously had to serve only fifteen years to become eligible and that the Texas Legislature has since "changed those minimum requirements of years in the penitentiary." Although the Legislature could "easily" change the requirements again, he reminded the jurors that "the parole law itself is not for [their] consideration" and that they "[we]re not permitted to consider[] what the [L]egislature might do in the future." At no point did Sheppard object to those comments.

No. 18-70011

Before a death penalty can be imposed, Texas law requires that the jury evaluate whether (1) "the defendant would commit criminal acts of violence" in the future; (2) "the defendant actually caused the death of the deceased or" simply "intended . . . or anticipated that a human life would be taken"; and (3) mitigating circumstances such as the defendant's character, background, and moral culpability instead warrant a sentence of life imprisonment. TEX. CODE CRIM. PRO. ANN. art. 37.071, § 2(b)(1)–(2), (e)(1). At the punishment phase, the state introduced evidence that Sheppard had a poor reputation for being peaceful and law-abiding in her community. She had formerly "jacked" cars for profit and had participated in a drive-by shooting that resulted in the victim's hospitalization. The night before the murder, Sheppard had been seen "dressed in dark clothing" and closely following "a lady who was . . . practically running across the parking lot." And while in prison awaiting trial, Sheppard allegedly had bragged about the murder and threatened to harm one of the inmates. Meagher's family also testified to the impact of her gruesome murder, which left them "depressed," "fatigued[,] and . . . traumatized."

In response, the defense called Patricia Birdwell, the director of the Matagorda County Women's Crisis Center, who testified that her organization provided protection for abused women and that Sheppard had been admitted to the center. Birdwell introduced records showing that, at the time, Sheppard had been in "a lot of pain," wanted a divorce, and was seeking legal assistance.

Next, Ronda Robinson, the records custodian for Covenant House, discussed that Sheppard had been admitted to the emergency shelter for runaway and homeless youth. As evidenced by the records, Sheppard came to Covenant House on two occasions, "looking for shelter for her and her baby." She had a history of running away from home and alleged that her mother had physically abused her. By the age of seventeen, Sheppard was

pregnant with her second child and had dropped out of the tenth grade.

The defense then called psychiatrist Priscilla Ray, who had reviewed Sheppard's prison medical records and conducted a two-hour psychiatric interview to evaluate her sanity, competence, and the influence of abusive men. Although Ray was not asked to perform a medical diagnosis, she was able to conclude that Sheppard suffered from chronic depression that was likely genetic and only partially treated. Ray testified that Sheppard had appeared sad throughout the interview and had cried when recounting the murder. Though recognizing that Sheppard tended to be "a follower," Ray predicted that she was unlikely to pose a continuing threat to society, especially in prison where she would be insulated from the influence of abusive men.

In addition to Ray's testimony, the defense introduced a five-page report of her clinical evaluation, which offered a somber glimpse into Sheppard's troubled past. As the report revealed, Sheppard's parents divorced when she was an infant, leaving her primarily in the care of her grandmother. Sheppard struggled to perform well in school and had to retake the fourth grade. Between the ages of three and five, her babysitter's boyfriend repeatedly molested her and forced her to perform oral sex. And as a teenager, she was raped at knifepoint while living on the streets. At age nineteen, Sheppard already had three children, each from a different father. Jerry Bryant, the father of her youngest child, was physically abusive and threatened to kill her if she ever left him. Perhaps unsurprisingly, Sheppard admitted to experiencing depression and mood swings and to hearing voices in her head. She also confided that she had helped murder Meaghan because Dickerson had "pulled a knife on her," saying that "he would kill her and her baby" if she did not comply. She allegedly "went into shock" and acted only under duress.

The defense then summoned family friend Patrice Green, who testi-

fied that Sheppard had faithfully attended church her whole life.  Finally, Sheppard's grandmother, Annie Smith, confirmed that Bryant had abused Sheppard.  During closing arguments, defense counsel specifically pointed to Ray's report and directed the jury to consider Sheppard's "background, her record, [and] her emotional instability" as mitigating factors.  Despite counsel's efforts to portray Sheppard favorably as a "young . . . female" with "kids" and "a background of abuse," the jury sentenced her to death.

The Texas Court of Criminal Appeals ("TCCA") affirmed Sheppard's conviction and sentence on direct appeal.  The court rejected Sheppard's claim that the prosecutor had improperly struck Simpson because he was black, noting that "[t]he State's race-neutral apprehensions [we]re well established in the record."  Sheppard applied for state habeas relief, renewing her *Batson* challenge and alleging, *inter alia*, that her attorney was ineffective in failing to (1) investigate and present sufficient mitigating evidence at the punishment phase; (2) object to the trial judge's erroneous instruction on the law of parties; and (3) object to the prosecutor's misleading statements regarding parole availability.

In support of her application, Sheppard submitted affidavits from a number of fact and expert witnesses whom defense counsel had failed to call.  Collectively, the fact witnesses attested at length to Sheppard's academic struggles, teenage pregnancies, sexual exploitation, and physical abuse at the hands of her mother and Bryant.  For instance, Sheppard's affidavit recounted how her mother would frequently whip her with a belt and even attempted to strangle her with a phone cord.  When Sheppard first became pregnant at the age of thirteen, her mother "beat [her] half to death," leading her to abort the child.  Although Ray's report mentioned only one instance of sexual assault as a teenager, Sheppard was also raped at a party as she "phased in and out of consciousness."  Her relationship with Bryant fared little better: He claimed to "observe[] [her] every movement," often pointed

guns or knives at her, and once beat her until she lost consciousness.  Her family was fully aware of the abuse, as she occasionally fled to her brother or mother's houses to escape Bryant.

The expert witnesses contributed still greater detail to Sheppard's mental state.  Upon conducting a twelve-hour clinical interview with Sheppard and a two-hour interview with her mother, psychiatrist Rebekah Bradley diagnosed Sheppard with severe depression, posttraumatic stress disorder, and dissociative disorder.  Psychologist Myla Young likewise performed an eighteen-hour neuropsychological evaluation of Sheppard and concluded that she had the mental-age equivalence of a fourteen-year-old.  Young also determined that, when confronted with stressful situations, Sheppard "would be vulnerable . . . to the influence of others" and would likely "respond[] in a non-thinking, automaton-like way rather than as a thinking and reasoning adult."  Nevertheless, psychologist Mark Cunningham highlighted Sheppard's gender and continuing family relationships with her children, mother, and grandmother as significant factors that reduced the likelihood of a future offense.

After scheduling an evidentiary hearing, the habeas trial court held that defense counsel was ineffective in neglecting to develop adequate testimony as to Sheppard's character, background, and mental illnesses.  Yet the court found no deficiency or resulting harm in counsel's failure to object to the statements of the trial judge and the prosecution during voir dire, given the judge's subsequent curative instructions.  The court further refused to revisit the *Batson* claim on collateral review.

The TCCA summarily affirmed the lower court's recommendations except with regard to the failure to introduce mitigating evidence.  As the TCCA reasoned, the evidence that "the trial court fault[ed] counsel for not developing . . . was actually before the jury through the testimony and report

of Birdwell, Dr. Ray, and others." *Ex Parte Sheppard*, No. WR-78,132-01, 2013 WL 5568434, at \*2 (Tex. Crim. App. Oct. 9, 2013) (per curiam). Thus the court held that counsel was not ineffective in refusing "to present cumulative testimony." *Id.*

Sheppard filed a habeas petition under 28 U.S.C. § 2254. Though the district court found that counsel was deficient in investigating and presenting mitigating evidence that may well have affected the outcome, it noted that "the TCCA's contrary conclusion must be considered under the stringent and deferential standards" of AEDPA. Because "Sheppard d[id] not meet her heavy burden to show" that the TCCA's ruling was unreasonable, the court denied habeas relief. The court granted a certificate of appealability on that claim, which we expanded to include the other issues.

## II.

"As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011). Instead, "[§] 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03. As relevant here, AEDPA precludes habeas relief unless the state court's adjudication of the claim resulted in a decision that (1) "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

A state court ruling involves an unreasonable application of federal law "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (internal quotation

marks and citation omitted).  "A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence." *Young v. Dretke*, 356 F.3d 616, 624, 629 (5th Cir. 2004).

Sheppard avers her counsel was ineffective in developing mitigating evidence and in failing to object to certain comments regarding the law of parties and parole eligibility.  She further maintains that the state violated her rights under *Batson* in striking Simpson from the jury.  The TCCA reasonably rejected each of those claims.

## A.

The Sixth Amendment secures the right to effective assistance of counsel.  Under *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984), a defendant must establish that (1) her counsel's representation was objectively deficient and (2) that she suffered prejudice as a result.  *See Garza v. Idaho*, 139 S. Ct. 738, 744 (2019).  An attorney's performance is deficient where the proffered "representation fell below an objective standard of reasonableness" as assessed "under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotation marks and citation omitted).  And a defendant is prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different."[1]  To evaluate that probability, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per

---

[1] *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (per curiam) (emphasis added). That a different result *could* have been reached is not enough. *See Adekeye v. Davis*, 938 F.3d 678, 683 (5th Cir. 2019).  Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

curiam) (cleaned up) (citation omitted).

Where § 2254(d) applies, our review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "We take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (internal quotation marks and citations omitted).

1.

Sheppard challenges the appropriate standard of review under § 2254(d). Traditionally, we have focused our review "on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam). We consider "not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it *could have* relied upon."[2] Under that standard, so long as a plausible argument exists to support the ruling, we defer to the decision of a state court even if its actual rationale was unreasonable.

Sheppard asserts that *Neal* is no longer good law following *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). *Wilson* principally addressed how to review a case in which a lower state court explained its reasoning but a higher state court did not.[3] In resolving that question, the Court directed a federal habeas

---

[2] *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017) (emphasis added); *see also Neal*, 286 F.3d at 246 ("It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

[3] *Wilson*, 138 S. Ct. at 1192. That issue was the subject of a circuit split between the Eleventh Circuit and every other court of appeals to have considered the matter. *See id.* at 1194.

court to "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Id.* at 1192. Moreover, a federal court should "train its attention on the *particular reasons*—both legal and factual—why state courts rejected a state prisoner's federal claims and . . . give appropriate deference to that decision." *Id.* at 1191–92 (emphasis added) (internal quotation marks and citation omitted). Shepperd thus urges that we owe no additional deference under § 2254(d) where a state court's actual reasoning is unjustifiable.[4]

This court has not assessed *Neal*'s continuing vitality in the wake of *Wilson*,[5] and we need not do so today. Even assuming that *Wilson* permits us

---

[4] *See Thomas v. Vannoy*, 898 F.3d 561, 568 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1321 (2019) (noting that "[t]he continued viability of [*Neal*] . . . is uncertain" after *Wilson*).

[5] "[W]e . . . only decide whether an issued Supreme Court decision has 'unequivocally' overruled our precedent." *United States v. Guerrero*, 768 F.3d 351, 361 (5th Cir. 2014). We observe, without deciding, that it is far from certain that *Wilson* overruled *sub silentio* the position—held by most of the courts of appeals—that a habeas court must defer to a state court's ultimate *ruling* rather than to its specific *reasoning*. *See Neal*, 286 F.3d at 246; *see also Whatley v. Zatecky*, 833 F.3d 762, 775 (7th Cir. 2016) (holding that a petitioner is not entitled "to *de novo* review simply because the state court's rationale is unsound"); *Holland v. Rivard*, 800 F.3d 224, 236 (6th Cir. 2015) ("[A] habeas petitioner must show that there was *no reasonable basis* for the state court to deny relief . . . *whether or not* the state court reveals [its reasoning]." (internal quotation marks and citation omitted)); *Bonney v. Wilson*, 754 F.3d 872, 884 (10th Cir. 2014) (considering "what arguments or theories supported or . . . could have supported, the state court's decision" (citation omitted)); *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) ("[W]e examine the ultimate legal conclusion reached by the court, not merely the statement of reasons explaining the state court's decision." (citation omitted)); *Gill v. Mecusker*, 633 F.3d 1272, 1291 (11th Cir. 2011) (focusing on the "state court's ultimate conclusion" instead of "the reasoning that led to th[at] result"); *Clements v. Clarke*, 592 F.3d 45, 55–56 (1st Cir. 2010) ("It is the result to which we owe deference, not the opinion expounding it."); *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (noting that "deficient reasoning will not preclude AEDPA deference at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated" (citations omitted)).

to afford deference to only the state court's proffered reasoning—instead of its result—deference is still due because the TCCA's decision was reasonable.

Sheppard claims that counsel's performance was deficient because he neglected to call her, her mother, or her brother, thereby preventing the jury from learning crucial details about her character and the struggles she had endured.  Although Ray and Smith did testify, Sheppard faults counsel for failing to ask them about her grim upbringing or her family's history of mental illness.  She further emphasizes that, despite being aware of her past, counsel merely requested that Ray evaluate Sheppard's sanity, competence, and the influence of abusive men.  Notably, however, he never sought a comprehensive psychiatric diagnosis even though the trial court had authorized funds for a medical expert and Ray was fully capable of conducting such an evaluation.[6]

In denying relief, the TCCA observed that the evidence Sheppard chided counsel for not investigating and presenting "was actually before the jury through the testimony and report of Birdwell, Dr. Ray, and others." *Sheppard*, 2013 WL 5568434, at *2.  Hence, even assuming that counsel's performance was deficient, the TCCA reasonably found that Sheppard failed to establish prejudice.  After all, the records from the two shelters made clear that Sheppard had experienced spousal and parental abuse, had run away from home, had dropped out of the tenth grade, and had had multiple teenage pregnancies.  Likewise, Ray's report revealed that she had been repeatedly

---

[6] In a footnote, Sheppard alleges that counsel erred in failing to summon a number of other fact witnesses.  But she does not explain why that decision was deficient or prejudicial.  Accordingly, those arguments are waived.  *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("A single conclusory sentence in a footnote is insufficient to raise an issue for review.").

molested and forced to perform oral sex as a young child.  It further described that she had been raped at knifepoint while living on the streets and that Bryant had beaten and threatened to kill her.  Had Sheppard, her mother, or her brother testified at trial, their habeas affidavits show that they would have added few details to this already woeful story.

As counsel later admitted, however, the defense did a less-than-perfect job of eliciting live testimony of Sheppard's character and background from Ray or Smith.  He asked Smith only whether Bryant had abused Sheppard and never even broached the topic of her past with Ray.  Nevertheless, the jury already had access to such mitigating evidence via the shelter records and Ray's report.  Equally importantly, counsel highlighted the report at closing argument and encouraged the jury to consider Sheppard's "background, her record, [and] her emotional instability."  Under those circumstances, the TCCA reasonably concluded that any deficiency in presenting the testimony of Ray and Smith did not affect the outcome.

The same is true of the expert testimony that Sheppard adduced during the postconviction proceedings.  Those findings established that Sheppard had the mental development of a fourteen-year-old and suffered from major depression, posttraumatic stress disorder, and dissociative disorder.  Though Young determined that Sheppard was vulnerable to the influence of others, Cunningham predicted that her status as a female with close familial relationships decreased the risk that she would perpetuate future acts of violence.  Once again, however, that same evidence was substantially before the jury.  In fact, Ray observed that Sheppard experienced depression and mood swings and heard voices in her head.  Ray also testified that, although susceptible to the influence of abusive men, Sheppard was unlikely to pose a continuing threat of violence in the structured confines of prison.  Because Ray thus previewed the salient points of the subsequent expert findings, we cannot say that the TCCA "applied [*Washington*] to the facts of [t]his case in an objec-

tively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Nevertheless, Sheppard contends that, in declaring the additional mitigating evidence to be cumulative, the TCCA ignored the expert findings and narrowly focused on the testimony of Smith, Robinson, and another employee at the Women's Crisis Center.  Sheppard thus insists that the TCCA unreasonably applied clearly established federal law, which requires a court to assess prejudice under the totality of the evidence.  *See Porter*, 558 U.S. at 41.

But we do not sit to grade the thoroughness of a state court's opinion.  To be sure, "we have no power to tell state courts how they must write their opinions," nor will we "impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim."  *Coleman v. Thompson*, 501 U.S. 722, 739 (1991).  Rather, training our attention on the reason why the TCCA denied relief, we "give appropriate deference" to its finding that the additional mitigating evidence was cumulative.[7]

Moreover, even assuming *arguendo* that our review is *de novo*,[8] Sheppard's claim of prejudice would still fail.  That is even more true considering that, when reviewing *de novo*, we must weigh Sheppard's mitigation evidence against the aggravating evidence offered at trial.  *See Porter*, 558 U.S. at 41.

---

[7] *See Wilson*, 138 S. Ct. at 1191–92; *see also Meders v. Warden*, 911 F.3d 1335, 1349 (11th Cir. 2019) ("[The Court's directive in *Wilson*] does not mean we are to flyspeck the state court order or grade it.  What it means is we are to focus not merely on the bottom line ruling of the decision but on the reasons, if any, given for it.").

[8] Even if AEDPA deference did not apply, Sheppard "would not automatically be entitled to habeas relief.  Instead, [s]he would still need to show—under a *de novo* review standard—that [s]he is in custody in violation of the Constitution . . . of the United States."  *Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019) (en banc) (internal quotation marks omitted), *cert. denied*, 206 L. Ed. 2d 826 (2020).

And that aggravating evidence is damning.  The jury was well aware of Sheppard's intent to "rob whoever was in[side]" Meagher's apartment and of her efforts to effectuate that purpose.  Despite Meagher's pleas to spare her life for the sake of her two children, Sheppard helped restrain her and retrieved the butcher's knife that was used to hack at her throat.  The state also introduced evidence that Sheppard had attempted a similar robbery the night before and had bragged about Meagher's murder while in prison.  Given the weight of such aggravating evidence, Sheppard has not shown that, but for her counsel's failure to present cumulative mitigating evidence, "the result of the proceeding would have been different." *Andrus*, 140 S. Ct. at 1881.

### 2.

Sheppard maintains that counsel was ineffective in failing to object to the erroneous instruction regarding Texas's law of parties.  Specifically, the judge stated that each party to an offense "should be equally responsible as to punishment."  Sheppard urges that, in doing so, the court denied her right to due process and to an individualized sentencing under the Eighth and Fourteenth Amendments.  The state does not contest that the instruction was inaccurate and that counsel should have objected.  But it maintains that any deficiency was harmless.

We agree.  The trial judge gave the erroneous instruction over a week before the start of the punishment phase to a single venire panel from which only one juror was ultimately selected.  It therefore strains credulity to assume that one stray comment would affect the entire outcome of the jury's deliberations at sentencing.  That is especially so given that the judge later instructed the jury to "consider all evidence submitted to [them] during the whole trial as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."   What's more, the judge directed the jury "not [to]

consider the instructions given [them] in the first phase of trial that relate to the law of parties and the responsibility of parties for the acts or others in the commission of offenses." Instead, the jury was told to "consider only the conduct and state of mind of this defendant in determining what your answers to the special issues shall be." Because jurors are presumed to follow their instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), Sheppard has failed to demonstrate prejudice.

Sheppard rejoins that "[s]ome comments . . . may be so prejudicial that even good instructions will not cure the error." *United States v. Saenz*, 134 F.3d 697, 713 (5th Cir. 1998) (per curiam) (citation omitted). But that is not the case here. Unlike in *Saenz*, 134 F.3d at 712–13, the court did not "extensively question[] the two key witnesses . . . on matters at the heart of the case" in a brief "trial lasting only two days."[9] Nor did the judge express a damaging opinion on the credibility of a witness.[10] Rather, the judge made one inadvertent remark over the course of a lengthy trial, and he took special pains to cure the error at sentencing. "[O]nly by specifically alerting the jurors to the particular statement at issue and then instructing them to disregard it could he have given a stronger curative charge." *United States v. Lance*, 853 F.2d 1177, 1183 (5th Cir. 1988). The TCCA thus appropriately dismissed Sheppard's claim.

3.

Similarly, Sheppard's claim that counsel was ineffective in failing to

---

[9] *See also United States v. Hoker*, 483 F.2d 359, 368 (5th Cir. 1973) (concluding that "[n]o amount of boiler plate instructions . . . could be expected to erase" the effect of the judge's active questioning of various witnesses).

[10] *See United States v. Cisneros*, 491 F.2d 1068, 1075 (5th Cir. 1974) (holding that "the cautionary instructions advising the jury of its role as fact-finder" failed to cure the judge's subsequent comment that one of the witnesses was lying).

object to the statements concerning parole availability is without merit. During voir dire, the prosecutor correctly remarked to three jurors that Sheppard would have to serve thirty-five years before being eligible for parole. He added, however, that previously a defendant was required to serve only fifteen years and that the legislature could change the requirement again. Sheppard maintains that the statement wrongly implied that she could be released from prison in as little as fifteen years and that counsel failed to correct that misconception.

Yet Sheppard ignores that the prosecution also reminded the jurors that "the parole law itself is not for [their] consideration" and that they "[we]re not permitted to consider[] what the [L]egislature might do in the future." The prosecution's comments were thus consistent with Texas law, which prohibits the consideration of parole in a capital murder prosecution. *See Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996). As a result, counsel was not deficient in failing to object.

Additionally, Sheppard has not established prejudice. At the punishment phase, the trial judge clarified "that a prisoner serving a life sentence for the offense of capital murder is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good time, equals thirty-five (35) years." Sheppard maintains that the instruction never corrected the prosecution's corollary statement, which implied that thirty-five years was not guaranteed. Even if that were true, the judge further instructed the jury that it may "not . . . consider or discuss the possible action of the Board of [Pardons] and Paroles or the governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant." Absent any evidence to the contrary, we presume that the jury followed those curative instructions and that any alleged deficiency was therefore harmless. *See Weeks*, 528 U.S. at 234.

No. 18-70011

### B.

The Equal Protection Clause of the Fourteenth Amendment proscribes the use of a peremptory challenge on the basis of race. *See Batson*, 476 U.S. at 89. To prevail on a *Batson* claim, a defendant must first make a *prima facie* showing that the prosecutor removed a juror on account of race. If the defendant does so, the burden shifts to the prosecution to propound a race-neutral explanation for the peremptory challenge. Lastly, the "court must determine whether the defendant has carried his burden of proving purposeful discrimination." *United States v. Thompson*, 735 F.3d 291, 296 (5th Cir. 2013). Where, as here, the state volunteered an explanation for the strike, we need not consider the first step of the analysis. *Id.* at 297.

At trial, the prosecutor articulated four independent reasons for striking Simpson. First, Simpson appeared reluctant to impose the death penalty based solely on the facts of the crime. Second, he suggested that he would consider, as a mitigating factor, whether a defendant had children. Third, as a victim of a false arrest, Simpson may have empathized with Sheppard's situation. Fourth, he displayed "affinity" toward Sheppard by greeting only her and not the prosecution. Because those reasons are facially neutral, we proceed to the final prong of the *Batson* analysis.

Sheppard invokes *Miller-El v. Dretke*, 545 U.S. 231 (2005), in asserting that the state's explanation is disingenuous. There, the Court recognized that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Id.* at 241. That is true "even if the two jurors are dissimilar in other respects."[11] Sheppard

---

[11] *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009); *see also Miller-El*, 545 U.S. at 247 n.6 ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not

persuasively posits that the prosecutor's first two reasons appear disingenuous, given Chambers's testimony on voir dire.  As the state concedes on appeal, Chambers was likewise hesitant to give the death penalty based on the facts of the crime alone and admitted that he would consider a defendant's children when assessing punishment.  But even though the first two reasons for striking Simpson applied equally to Chambers, the prosecutor removed only Simpson.  The decision to do so therefore suggests that the explanation may have been a pretext for discrimination.

Nevertheless, a *Batson* claim will not succeed where the defendant fails to rebut each of the prosecutor's legitimate reasons.[12]  There is no indication that the prosecutor's third reason was pretextual, because Sheppard has not identified a white juror who was the victim of a false arrest and yet was accepted by the State.  Sheppard's attempt to portray Herd as a similarly situated juror is unavailing.  Whereas Herd stated that his son had been lawfully prosecuted for an incident with his girlfriend, Simpson himself was falsely arrested.  Furthermore, Sheppard does not dispute that Simpson acknowledged only her and not the prosecution.  Instead, she merely insists that "the claimed 'affinity' between a young black woman and a young black man" is obviously pretextual.  Such bald assertions of pretext are unconvincing, especially in light of the deference AEDPA affords to a state court's factual findings.[13]

---

products of a set of cookie cutters.").

[12] *See, e.g., Fields v. Thaler*, 588 F.3d 270, 277 (5th Cir. 2009) (dismissing a *Batson* challenge where the defendant did not dispute the prosecutor's "additional, race-neutral reasons" for the strike); *Stevens v. Epps*, 618 F.3d 489, 500 (5th Cir. 2010) (rejecting a *Batson* claim "where more than one reason [wa]s given for a strike, and the *Batson* challenger fail[ed] to rebut one of the reasons").

[13] *See Stevens*, 618 F.3d at 499 (deferring under AEDPA "to the trial court's implicit factual finding that the prosecutor was credible when he stated that . . . he [had]

No. 18-70011

Additionally, unlike in *Miller-El*, 545 U.S. at 263, there is no evidence that the district attorney's office had "a specific policy of systematically excluding blacks from juries," nor did the prosecution employ manipulative questioning or "jury shuffles" to remove African-Americans, *id.* at 254, 261. Moreover, insofar as statistical data is useful,[14] the record suggests that the prosecution did not strike Simpson on account of race. Notably, two of the jurors selected were African-American, and the state exercised only three of its nine peremptory challenges against African-American venire members. Hence, the TCCA properly rejected Sheppard's *Batson* claim.

AFFIRMED.

---

struck [the prospective juror]" because of her demeanor).

[14] *See Medellin v. Dretke*, 371 F.3d 270, 278–79 (5th Cir. 2004) (per curiam) ("For the statistical evidence to be relevant, data concerning the entire jury pool is necessary. The number of strikes used to excuse minority and male jury pool members is irrelevant on its own.").

No. 18-70011

KING, *Circuit Judge*, dissenting:

Erica Sheppard was sentenced to death by a jury that did not know that she has brain damage and the cognitive ability of a fourteen-year-old. And the jury heard only isolated snippets of the extensive abuse and trauma that she suffered throughout her life. Unlike the majority, I cannot shrug off these important matters as mere cumulative evidence. I therefore agree with the state trial court and the district court below that Sheppard was prejudiced by her counsel's deficient performance. With respect, I dissent.

## I.

The majority accurately restates the sad facts of this case, so I begin with the appropriate standard of review.

As the majority correctly states, under 28 U.S.C. § 2254(d), a habeas petitioner challenging a state-court ruling must demonstrate that the challenged decision either was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018). But the Supreme Court has recently explained that "[d]eciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the *particular reasons*—both legal and factual—why state courts rejected a state prisoner's federal claims.'" *Id.* at 1191-92 (emphasis added) (citation omitted). And the Court stated explicitly that, "when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . , a federal habeas court simply reviews *the specific reasons* given by the state court and defers to *those reasons* if they are reasonable." *Id.* at 1192 (emphases added). Aside from this deference to the state court's reasoning, we review

the district court's conclusions of law de novo and its findings of fact for clear error. *See Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012).

By contrast, the majority notes that, "[t]raditionally, we have focused our review 'on the ultimate legal conclusion that the state court reached.'" Maj. Op. 10 (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)). Under *Neal*, the majority says, it is enough that "a plausible argument exists to support the [state court's] ruling, . . . even if its actual rationale was unreasonable." *Id.*; *accord id.* ("We consider 'not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it *could have* relied upon.'" (quoting *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017))).

But that approach is now foreclosed by *Wilson*. In *Wilson*, the Supreme Court explained that the majority's "'could have supported' framework" applies only when a "state court's decision is unaccompanied by an explanation." 138 S. Ct. at 1195 (quoting *Harrington v. Richter*, 562 U.S. 86, 98, 102 (2011)). It does not apply when state courts provide "a reasoned decision" that federal courts can review. *Id.*; *see also Thomas v. Vannoy*, 898 F.3d 561, 568 (5th Cir. 2018) ("The continued viability of this approach after the Supreme Court's decision in *Wilson v. Sellers* is uncertain . . . ."), *cert. denied*, 139 S. Ct. 1321 (2019). Indeed, *Wilson*'s central holding is that "when the relevant state-court decision on the merits" does not provide its "reasons," a federal habeas court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." 138 S. Ct. at 1192. The Court's repeated emphasis on state-court *reasons* would be hard to understand if those reasons were irrelevant to the federal habeas court's review.[1]

---

[1] The majority expresses doubt that the Supreme Court overruled *Neal* and similar

No. 18-70011

Accordingly, the first question we face is whether the actual rationale of the Texas Court of Criminal Appeals was reasonable.[2]

## II.

## A.

The TCCA stated its actual rationale clearly and concisely. It rejected the trial court's conclusion that "counsel was ineffective in the presentation of mitigation evidence at trial" because, it ruled, "the testimony the trial court faults counsel for not developing" would have been "cumulative," and "[a] decision not to present cumulative testimony does not constitute ineffective assistance." This reasoning forms the entire basis for the TCCA's rejection of Sheppard's ineffective-assistance-of-counsel claim.

This reasoning is unreasonable. To be sure, Sheppard's trial counsel did present some evidence of Sheppard's horrific upbringing and the abuse that she had suffered in her life. *See* Maj. Op. 4-6. Accordingly, although trial counsel failed to call lay witnesses who could have testified about Sheppard's upbringing and abuse in greater detail, the TCCA was not *unreasonable* in

decisions "*sub silentio*." Maj. Op. 11 n.5. But there is nothing silent about the Court's explicit language in *Wilson*. And in any event, we would not be the first court of appeals to recognize that *Wilson* means what it says. In *Gish v. Hepp*, 955 F.3d 597 (7th Cir. 2020), for example, the Seventh Circuit, following *Wilson*, rejected as unreasonable a state court's "exact reasoning" before upholding, on de novo review, that state court's ultimate conclusion. *Id.* at 601, 604, 607; *see also id.* at 603 ("Where, as here, the state court issued an explanatory opinion, we 'review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable.'" (quoting *Wilson*, 138 S. Ct. at 1192)). Similarly, the Eleventh Circuit has explained that *Wilson* "means . . . that we are to focus not merely on the bottom line ruling of the decision but on the reasons, if any, given for it." *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1349 (11th Cir.), *cert. denied sub nom. Meders v. Ford*, 140 S. Ct. 394 (2019).

[2] The majority asserts that the foregoing is unnecessary to decide because, in this case, "the TCCA's decision was reasonable." Maj. Op. 11. For the reasons explained below, I disagree.

concluding that *that* additional testimony would have been cumulative. But trial counsel's failure to present mitigation testimony went further.

Trial counsel also failed to call expert witnesses who could have testified that Sheppard had the cognitive ability of a fourteen-year-old and that she suffered from organic brain dysfunction, posttraumatic stress disorder, and dissociative disorder. And those expert witnesses could also have testified to the impact that those mental defects had on Sheppard's decision-making processes. For example, one such expert has opined that, "[i]n a confusing, emotional and/or complex situation, Ms. Sheppard would be vulnerable to responding in a non-thinking, automaton-like way rather than as a thinking or reasoning adult. Once action is initiated, Ms. Sheppard's ability to re-evaluate the situation, anticipate the consequences and change her actions would also be impaired." Because of trial counsel's deficient performance, the jury did not hear this testimony or anything like it. In other words, the evidence that trial counsel failed to develop would in no sense have been "cumulative."

## B.

The majority disagrees, stating that the "same evidence was substantially before the jury." Maj. Op. 13. The majority recites that the jury heard that "Sheppard experienced depression and mood swings and heard voices in her head" and that "Sheppard was unlikely to pose a continuing threat of violence in the structured confines of prison." *Id.* Consequently, the majority concludes, the evidence presented at the punishment phase of Sheppard's trial "previewed the salient points of the subsequent expert findings," and thus the TCCA was not unreasonable in finding the proposed expert testimony cumulative. *Id.*

The majority's position is difficult to swallow. Evidence that Sheppard had brain dysfunction and the mental development of a child, not to

mention PTSD and dissociative disorder—and that, as a result, she had significantly impaired ability to make independent decisions in stressful and emotional situations—cannot be dismissed as simply "cumulative" of the evidence that Sheppard "experienced depression and mood swings and heard voices in her head." Among other things, the evidence of Sheppard's diminished decision-making ability would have bolstered her story, which was presented to the jury, that she committed the murder while in a state of "shock" after her codefendant "pulled a knife on her" and threatened to kill her baby daughter. Sheppard's trial counsel did not simply fail to elaborate on *depression and mood swings*; rather, counsel failed to present evidence that Sheppard had "'significant' mental and psychological impairments," *Sears v. Upton*, 561 U.S. 945, 956 (2010). Accordingly, it was unreasonable for the TCCA to dismiss Sheppard's proposed mitigation evidence as merely cumulative.

### III.

Because I conclude that the TCCA's opinion was unreasonable, I proceed to analyze Sheppard's claim of ineffective assistance of counsel on the merits. For the following reasons, I agree with the district court and the state trial court that Sheppard has demonstrated that her constitutional rights were violated.[3]

### A.

As part of determining whether counsel's representation "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), we examine whether counsel violated his "duty to investigate." *Id.* at 690. "[C]ounsel has a duty to make reasonable investigations or

---

[3] I concur with the majority's disposition of Sheppard's other claims. *See* Maj. Op. 15-20.

to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. In the context of a capital case, this includes conducting an "adequate investigation in preparing for the sentencing phase . . . , when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). "In assessing the reasonableness of an attorney's investigation," we "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

In this case, Sheppard's trial counsel, Charles Brown, unreasonably failed to investigate two different avenues of potential mitigation: first, as alluded to previously, he failed to obtain an expert evaluation of Sheppard's mental condition, and second, he failed to sufficiently investigate Sheppard's life history.

1.

From the investigation that was performed, Brown was aware that Sheppard had been repeatedly sexually and physically abused as a child, that she suffered from depression, and that she struggled in school. *See* Maj. Op. 5. In addition to these red flags, Brown knew, in his own words, that there were "things about Erica Sheppard that [he] thought only a . . . medical doctor[,] psychologist, or psychiatrist could talk about." Despite this, however, Brown failed to consult with a neurologist, a neuropsychologist, an expert on the impact of trauma, or an expert on PTSD in preparation for the punishment phase of Sheppard's trial. Instead, Brown asked Dr. Priscilla Ray, a psychiatrist, to do nothing more than "to evaluate Ms. Sheppard's competency and sanity, as well as to evaluate whether Ms. Sheppard was likely to be influenced by men who were in a position to be abusive." Brown did *not* ask Ray to conduct a "psychiatric diagnosis," and so she did not. And although

Brown has since testified that he "believe[d]" that evaluating the impact of Sheppard's childhood abuse was part of Ray's assignment, it was clear at the time that Ray did not in fact conduct any such evaluation.

Brown's failure to obtain a more searching psychological evaluation of Sheppard was objectively unreasonable in light of then-prevailing professional norms. According to guidance from the American Bar Association, Brown should have made "efforts to discover all reasonably available mitigating evidence," including by using "the assistance of experts where it is necessary or appropriate." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (1989). Although the ABA guidelines are not legally binding, the Supreme Court has "long . . . referred [to them] as 'guides to determining what is reasonable,'" including this guideline specifically. *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688). And the Supreme Court has confirmed that failing to obtain expert neuropsychological evaluation of a brain-damaged defendant can constitute constitutionally inadequate representation. *See, e.g.*, *Sears*, 561 U.S. at 949-52; *see also Andrus v. Texas*, 140 S. Ct. 1875, 1882-83 (2020) (determining that counsel provided ineffective assistance where he failed to uncover evidence of trauma and PTSD despite knowing that defendant had a "seemingly serious mental health issue").

Before the state habeas court, Brown presented no strategic justification for failing to obtain such an evaluation. Nevertheless, the state argues that Brown acted reasonably because the evidence that would have turned up would have been "double-edged." Even if that were true, that would go toward the question of prejudice, not whether Brown acted reasonably. *See, e.g.*, *Druery v. Thaler*, 647 F.3d 535, 541-42 (5th Cir. 2011); *cf. infra* Section III.B.1. Here, Brown disregarded his duty to make a "thorough investigation of law and facts relevant to plausible options." *Mejia v. Davis*, 906 F.3d 307, 316 (5th Cir. 2018) (quoting *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir.

2017)), *cert. denied*, 139 S. Ct. 1229 (2019). Only *after* that duty is discharged may a defense attorney make "a tactical decision not to . . . present potentially mitigating evidence on the grounds that it is double-edged." *Id.* (quoting *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006)). Brown's failure to investigate here was in no sense a tactical decision.

2.

Brown delegated the task of investigating Sheppard's life history to an investigator. The investigator interviewed Sheppard and discovered that Sheppard "was molested" as a five-year-old and that she "suffered physical abuse from" Jerry Bryant, the father of her third child. These vague accounts hinted at Sheppard's traumatic life history, yet Brown never asked Sheppard for more details or for a fuller account of her life.

Brown also never interviewed Sheppard's brother, Jonathan Sheppard. Brown acknowledged that Jonathan "could have helped Erica Sheppard," but testified that he did not interview Jonathan because Jonathan "appeared" to be uninterested in assisting Sheppard's defense.

The record, however, belies any such appearance. For one thing, Jonathan willingly met with the investigator, as Brown knew, and even accompanied the investigator as he searched for Bryant. The investigator did not ask Jonathan about Sheppard's life history, however. Second, Brown's impression of Jonathan's unwillingness to assist was based on Jonathan's failure to affirmatively "come forward" to help Brown when Brown attended the trial of Sheppard's codefendant. But Brown acknowledged that he didn't know whether Jonathan even knew who he was at that time. Brown has thus demonstrated no strategic reason for failing to interview Jonathan about Sheppard's life history.

Brown did speak with Sheppard's mother, Madelyn McNeil, but he did not interview her about Sheppard's life history. Brown did not ask

McNeil about the abuse Sheppard experienced as a child or about Sheppard's pregnancies and trouble in school. The only explanation that Brown offered for why he failed to interview McNeil on these topics is that speaking to her "wasn't very pleasant." That is plainly not a strategic rationale.

In sum, Brown knew, among other things, that Sheppard had had an abusive and traumatic upbringing, but he failed to pursue the details of her life history. *Cf. Wiggins*, 539 U.S. at 527-28 ("[C]ounsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible."). These facts are similar to those in *Andrus*, where the Supreme Court determined that counsel provided ineffective assistance when he "abandoned [his] investigation of [Andrus'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 140 S. Ct. at 1882 (alterations in original) (citation omitted); *see also id.* ("Aside from Andrus' mother and biological father, counsel did not meet with any of Andrus' close family members, all of whom had disturbing stories about Andrus' upbringing."). In much the same way, Brown's representation at the sentencing phase of Sheppard's trial was constitutionally deficient. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (ruling counsel ineffective where he "ignored pertinent avenues for investigation of which he should have been aware").

## B.

"In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced [her] defense." *Wiggins*, 539 U.S. at 534 (citing *Strickland*, 466 U.S. at 692). "Under *Strickland*, a defendant is prejudiced by [her] counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter*, 558 U.S. at 40 (quoting *Strickland*, 466 U.S. at 694). "Here,

prejudice exists if there is a reasonable probability that, but for [her] counsel's ineffectiveness, the jury would have made a different judgment about whether [Sheppard] deserved the death penalty as opposed to a lesser sentence." *Andrus*, 140 S. Ct. at 1885-86. Because Texas law requires unanimity to impose the death penalty, Sheppard can demonstrate prejudice by showing a reasonable probability that even one juror would have changed his or her mind. *See id.* at 1886. Sheppard has met that burden.

1.

As already discussed, had Brown pursued a neuropsychological evaluation of Sheppard, he would have uncovered evidence that she had organic brain dysfunction, PTSD, dissociative disorder, and the cognitive ability of a fourteen-year-old. *See supra* Section II.A. And had he obtained this information, it would have been reasonable for him to present it to the jury, particularly in light of his avowed strategy of trying to convince the jury to "[t]ake mercy upon [Sheppard]."

This is precisely the sort of mitigation evidence that the Supreme Court has recognized might sway death-penalty jurors. In *Rompilla*, for instance, defense counsel unreasonably failed to uncover evidence that the defendant suffered from "organic brain damage" and had "a third grade level of cognition." 545 U.S. at 391-92 (citation omitted). Combining this with unpresented evidence of the defendant's abusive and traumatic childhood, *cf. infra* Section III.B.2, the Court determined that the defendant had "shown beyond any doubt that counsel's lapse was prejudicial." *Rompilla*, 545 U.S. at 390. Similarly here, Brown's failure to uncover and present this evidence prejudiced Sheppard.

The state asserts that evidence of Sheppard's mental condition would have been double-edged "because the jury may have seen the mental disorders as increasing Sheppard's future dangerousness." The state cites *Druery*

for this proposition, but in *Druery* this court concluded that evidence of mental illness would have been double-edged only because it would have undermined the defense's theory that the defendant's erratic behavior was due to drug use. *See* 647 F.3d at 540-42. By contrast, evidence that Sheppard was intellectually disabled, with the mind of a child, would not have undermined any of Brown's penalty-phase argument.[4]

### 2.

Had Brown discussed Sheppard's life history with Jonathan, McNeil, or Sheppard herself, he would have discovered—and then presented to the jury—substantially more information about Sheppard's traumatic life. *Cf.* Maj. Op. 6-7. Sheppard, for instance, could have testified that, when she was as young as three, she was physically abused by her regular babysitter, who beat her with extension cords, belts, and "whatever else [she] could get her hands on." This babysitter also forced Sheppard to walk to the store barefoot, causing her to burn her feet on the blacktop and cut her feet on broken glass. Sheppard could also have provided detailed testimony into her mother's physical abuse: She could have testified that her mother sometimes beat her so severely that her grandmother would physically intervene. And when she first became pregnant, at age thirteen, her mother "beat [her] half to death." Sheppard could have testified that her mother took various lovers, some of whom also physically abused Sheppard and her brother. And she could have testified that she ultimately moved out of her mother's house after her mother strangled her with a telephone cord. Sheppard could have testified that, at around age sixteen, she was drugged and raped at a party. Sheppard could have provided detailed testimony about Bryant's abuse as well: For

---

[4] As the majority notes, Brown's argument against future dangerousness was that, in prison, Sheppard would be "insulated from the influence of abusive men." Maj. Op. 5.

example, he once ran her car off the road while she was pregnant with his child. Later, after their child was born, the child became very sick and had to be hospitalized for weeks. Sheppard stayed with the child at the hospital, and Bryant came to the hospital, demanded that she come home so that he could have sex with her, and beat her until she lost consciousness. Bryant also repeatedly threatened Sheppard with knives and guns. Sheppard ultimately left Bryant after another beating, during which he dented her skull.

Sheppard's brother Jonathan also could have testified to her lifetime of abuse. He could have testified that their babysitter beat them, whipped them with electrical cords, and made them walk barefoot to the store. He could have testified that their grandmother beat them with a belt or with switches, and that their mother would beat them with "whatever she could find." And he could have testified about the time that Bryant attacked Sheppard at the hospital.

Finally, McNeil could also have testified to her daughter's traumatic life history. She could have testified that, from a young age, Sheppard witnessed physical fights between her father and McNeil. She could have testified that, at thirteen years old, Sheppard was sexually involved with a man in his twenties, and she could have corroborated that she whipped Sheppard when Sheppard first got pregnant. She also could have testified about the incident at the hospital and that Sheppard repeatedly fled to McNeil's home for fear of Bryant.

Because of Brown's failure to investigate, none of the foregoing information was presented to the jury. This case is thus similar to *Wiggins*, in which defense counsel unreasonably failed to uncover evidence that the defendant, who had a "diminished mental capacity," had "suffered physical torment, sexual molestation, and repeated rape" during his childhood. 539 U.S. at 535. In *Wiggins*, the Supreme Court found "a reasonable probability

that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." *Id.* And the Court found that "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536. So too here.

The state argues that Sheppard was not prejudiced by Brown's failure to present this additional mitigation evidence because there is "no reasonable probability" that the evidence "would have persuaded the jury that Sheppard would not be dangerous in the future." But "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). For instance, in a case where evidence showed that the defendant, convicted of murder, had also committed "two separate violent assaults on elderly victims" and had "set[] a fire in the jail while awaiting trial," the Supreme Court observed that a "graphic description" of his "childhood[] filled with abuse and privation" might nevertheless change the jury's mind as to his "moral culpability." *Id.* at 368, 398.

Similarly, the majority asserts that "Sheppard has not shown that, but for her counsel's failure . . . , 'the result of the proceeding would have been different.'" Maj. Op. 15 (quoting *Andrus*, 140 S. Ct. at 1881). But Sheppard does not need to prove that Brown's ineffective assistance "more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Rather, she is required to show only a "reasonable probability" that one juror, having heard about her immature mental state and grim history of abuse, would have changed his or her mind about condemning her to death. *See Andrus*, 140 S. Ct. at 1885-86. Like the state trial court and the district court below, I believe that Sheppard has made this showing.

No. 18-70011

IV.

For the foregoing reasons, I would reverse the judgment of the district court.